**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **HSBC BANK (URUGUAY) S.A.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No.** |
| **v.** | ) | |
| | ) | |
| **SEABOARD CORPORATION** | ) | |
| Serve: 2101 SW 21st Street, | ) | |
| Topeka, Kansas 66604 | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Plaintiff HSBC Bank (Uruguay) S.A. (**"HSBC"**), by and through its counsel, for its causes of action against Defendant Seaboard Corporation (**"Seaboard"**) alleges and asserts as follows:

### I.   INTRODUCTION

1.     As inducement to cause HSBC to provide a credit facility to Cereoil Uruguay S.A. ("Cereoil"), which was 45% owned by Seaboard, Seaboard promised to HSBC that it was Seaboard's time-honoured and continuing policy to have Cereoil meet its financial and contractual obligations, and further promised to monitor Cereoil's financial condition in a timely manner. In addition, HSBC was to be secured by a price of grain contract between Cereoil and Seaboard, backed by a letter of credit in favor of HSBC. The Note to HSBC was due in October of 2017.

2.     Rather than having Cereoil meet its financial and contractual obligations, Seaboard directed Cereoil to divert grain to Seaboard under a contract not assigned to

1

HSBC, causing Cereoil to default on its obligations to HSBC. As a result, HSBC was damaged and brings this civil action.

3. Prior to the October due date on the promissory note, two Cereoil directors, appointed by Seaboard and acting at the behest of Seaboard, placed Cereoil into bankruptcy without any payment to HSBC.

4. This civil action is an action for breach of contract, breach of the covenant of good faith and fair dealing, promissory estoppel, unjust enrichment, fraud, negligent misrepresentation, and fraud by concealment arising out of Seaboard's actions that were contrary to the inducements made by Seaboard.

## II. PARTIES, JURISDICTION AND VENUE

5. Plaintiff HSBC is organized and existing under the laws of Uruguay and has its principal place of business in Montevideo, Uruguay.

6. Defendant Seaboard Corporation is a Delaware corporation with its principal place of business in Merriam, Kansas. It may be served with process at 2101 SW 21st Street, Topeka, Kansas 66604.

7. Jurisdiction is proper under 28 U.S.C. § 1332(a)(2) because this is a civil action where the matter in controversy exceeds $75,000 and is between a citizen of the State of Kansas and a citizen of a foreign state, Uruguay.

8. Venue is proper under 28 U.S.C. § 1391(b)(1). Seaboard is subject to the Court's personal judication because Seaboard's principal place of business is in Merriam, Kansas.

### III.   <u>GENERAL ALLEGATIONS</u>

**<u>HSBC's Relationship with Seaboard</u>**

9.     HSBC is engaged with the provision of banking services. It offers services to private and corporate clients such as loans, cards, investments, corporate accounts, cash management, foreign trade, funding, treasury, custody, leasing and others. The company was founded in 1977 and was acquired by HSBC Group in 2000. It is headquartered in Montevideo, Uruguay.

10.     HSBC entered into agreements to provide financing to Cereoil, which was engaged in purchasing and exporting grain produced in Uruguay.

11.     For many years, Uruguayan citizens Lucia Viana and William Johnson owned Cereoil.

12.     In May 2015, Seaboard acquired a 45% ownership of Cereoil from Lucia Viana. Seaboard was to be a strategic partner with Cereoil in expanding the company's activities in the region, which would mean the opening of branch offices in Brazil, Paraguay and Argentina and consolidating a soy crushing project.

13.     Before Seaboard acquired ownership of Cereoil, HSBC granted credit facility to Cereoil backed by personal guarantees of Lucia Viana, William Johnson, and Nolston S.A. (a company also owned by Lucia Viana and William Johnson, "Nolston"), as well as other personal guarantees, warrants, third-party documents, and export contracts.

14.     The terms of purchase of Seaboard's interest in Cereoil gave it the right to elect two directors of the company and the right to appoint Cereoil's Chief Financial

Officer.

15.     As acknowledged by Seaboard in its Note to its Consolidated Financial Statements in 2018, those individuals were "employed by Seaboard who served as directors at the behest of Seaboard, and the Chief Financial Officer of Cereoil, an employee of Seaboard who also served at the behest of Seaboard."

**The Inducement Letter**

16.     Seaboard's acquisition of ownership affected Cereoil's banking relationship with HSBC because one of Cereoil's owners – Seaboard – was not a personal guarantor its debts to HSBC as Lucia Viana had been before the acquisition.

17.     Before HSBC agreed to continue to extend credit to Cereoil under the new ownership of Seaboard and William Johnson, HSBC engaged in negotiations with Seaboard.

18.     The negotiations led to Seaboard (referred to as the "Company") providing a letter ("Inducement Letter") voluntarily signed by Seaboard dated July 13, 2015 for the agreed and recognized purpose of inducing HSBC to grant a credit facility to Cereoil and Nolston (referred to as the "Subsidiaries" in the Inducement Letter) up to the amount of $13,000,000.

19.     The Inducement Letter specifically represents as follows:

> The Company intends to maintain its present interest in the Subsidiaries as well as its financial, operational and trade relationship with them.

> The Company confirms to the Bank that it has been and currently is our time honoured and continuing policy to have our affiliates, partly or wholly owned, meet all of their

financial and contractual obligations, as approved by such affiliates' boards of directors. Nonetheless by accepting this letter, you acknowledge that this letter is not a guarantee, but rather merely states our intention to monitor the Subsidiaries' financial condition in a timely manner.

The Company appreciates this letter will be considered a further inducement towards the Bank granting the Facility to the Subsidiaries.

20.     Seaboard sent the Inducement Letter to HSBC at its address in Montevideo, Uruguay, under Seaboard's letterhead, from its address in Merriam, Kansas.

21.     Steven J. Bresky, President and Chief Executive Officer of Seaboard, signed the Inducement Letter.

22.     The Inducement Letter defines Cereoil as Seaboard's subsidiary:

(i) Seaboard Corporation (the "Company") a company duly organized and validity existing under the laws of Delaware, established at 9000 West 67th Street, Merriam, KS 66202 USA, is a direct or indirect shareholder of Cereoil Uruguay S.A. and Nolston S.A. (the "Subsidiaries"), having 45% (forty-five percent) of their shares . . .

23.     The Inducement Letter assures HSBC that Seaboard intended the Inducement Letter to apply broadly to all financial accommodations extended by HSBC in favor of Cereoil:

(ii) HSBC Bank (Uruguay) S.A, a financial institution duly organised and validly existing under the laws of the Uruguay, is willing to make available, credit or banking facilities, loans or advances or other financial accommodation in any form whatsoever or incur *liabilities in respect of any banking facility or other financial accommodation whatsoever*, including guarantees and/or swap/derivative transactions to the Subsidiaries, in the aggregate principal in any currency up to the amount of US$13,000,000 (Thirteen Million United States Dollars (the "Facility"). . . . (Emphasis Added).

24.     The Inducement Letter also stated that:

(iii) The Facility is being granted considering the Company's
ownership in the Subsidiaries.

25.     The Inducement Letter invited HSBC to accept its terms and rely on
Seaboard's undertaking by extending credit facilities to Cereoil and Nolston.

26.     In March 2016, Alejandro Guzman Bernal ("Guzman"), a Seaboard
employee and agent, came to Uruguay to act as Financial Manager of Cereoil.

27.     Upon information and belief, Guzman had full access to Cereoil's records
and financial systems and maintained direct communication with Seaboard regarding the
operation and financial management of Cereoil.

28.     Seaboard installed Guzman as Chief Financial Officer of Cereoil on or
about April 5, 2016. Guzman served as Chief Financial Officer at the behest of Seaboard.

29.     Guzman functioned as Seaboard's eyes and ears inside of Cereoil. He
passed information to and from Cereoil and Seaboard and exerted Seaboard's strategic
control over Cereoil.

30.     As of April 2016, HSBC's credit loss exposure to Cereoil was less than
$4,500,000, which was secured with collateral including personal guarantees, warrants
(pledge over grain), and assignment of export contracts between Cereoil and the Amaggi
Group, a Brazilian commodities company involved in the soybean industry.

31.     In April 2016, Guzman negotiated on behalf of Cereoil and Seaboard the
terms of the new credit facilities with HSBC.

32.     Guzman, Seaboard's employee and agent, proposed to finance the operation

of Cereoil in up to $10,000,000 to be guaranteed by an assignment of exporting assets/agreements between Seaboard and Cereoil, which was evidenced by a price of grain sale agreement between Cereoil and Seaboard signed on April 14, 2016 for 40,000 tons of soybeans, for which a letter of credit had been issued by Bank of Nova Scotia-Canada, for the sum of up to $12,800,000, and personal guarantee of William Johnson and Nolston.

33.     During these negotiations, Guzman stated that Seaboard and Cereoil sought a change in backing for the HSBC credit facility because of concern over "collectability risks with Amaggi we wish to avoid."

34.     Seaboard inaccurately represented that backing the HSBC credit facility with the price of grain sale agreement between Cereoil and Seaboard would be stronger and have fewer collectability risks than the Amaggi contract.

35.     In reliance on Seaboard's representations by Guzman and the Inducement Letter, HSBC agreed to replace the assignment of the Amaggi contract to HSBC with the price of grain contract between Cereoil and Seaboard, backed by a letter of credit.

36.     In reliance on Seaboard's representations by Guzman and the Inducement Letter, HSBC renewed the financing of Cereoil and extended it to a total sum of $10,000,000.

37.     In reliance on Seaboard's representations by Guzman and the Inducement Letter, HSBC released Lucia Viana from her personal guarantee after disbursement of the $10,000,000, on September 7, 2016.

38.     On April 22, 2016, Cereoil assured HSBC that the soybean seed referred to in the price of grain contract already existed and had been purchased from local producers or produced in Cereoil's fields. Cereoil assured HSBC that this grain was to be used "as a priority" for the price of grain contract between Cereoil and Seaboard, which had been transferred to HSBC.

39.     The April 26, 2016 promissory note provides that HSBC is entitled to all judicial and extrajudicial costs, including attorney's fees, arising from the collection of the promissory note.

40.     The Agreement assigning the April 2016 price of grain contract to HSBC provides that HSBC has the right to collect fees and expenses corresponding to extrajudicial collection efforts and costs in case of legal actions based on the Debtor's default.

41.     Seaboard appointed two directors of Cereoil, David Dannov ("Dannov") and Gail Cummings ("Cummings").

42.     Dannov and Cummings were also employed by Seaboard and served as directors of Cereoil at the behest of Seaboard.

43.     According to multiple Cereoil employees, including Andres Cappurro, an agricultural engineer for Cereoil who was in charge of the commercial team, and Enrique Garbino, a consulting accountant who was engaged on behalf of Cereoil in association with renegotiating bank debt, Seaboard had strategic control of Cereoil and established Cereoil grain's take-off and financial operations.

44.     Seaboard made decisions for Cereoil, controlled the group, and acted as de

facto administrators.

**Cereoil and Seaboard Fail to Perform the Contract Assigned to HSBC**

45.     After renegotiating the loan facility terms with HSBC in April 2016, Cereoil delivered nothing under the Seaboard price of grain contract, which had been assigned to HSBC.

46.     Unbeknownst to HSBC, Cereoil did not have enough grain to meet the contractual obligations it had undertaken to deliver grain to Seaboard.

47.     HSBC would have had the right to full payment backed by the letter of credit, had Cereoil delivered the grain to Seaboard under the price of grain contract that had been assigned to HSBC.

48.     The Cereoil board of directors met on or about April 5, 2016. Seaboard President and CEO Bresky and Seaboard employee Dannov attended the meeting from Kansas. Seaboard employees Guzman and Cummings attended the meeting by phone and video conference. Unbeknownst to HSBC at the time, the board discussed Cereoil's "delicate financial situation" and discussed "various plans and potential sales between Seaboard and [Cereoil] to create liquidity," including soybean contracts.

49.     On or about April 14, 2016, Cereoil and Seaboard entered into the price of grain contract for 40,000 tons of soybeans for shipment in October 2016. This contract was then used to guarantee HSBC's $10,000,000 loan to Cereoil.

50.     Days after HSBC dispersed the loan to Cereoil in April 2016, Cereoil's board of directors met on May 9, 2016 and discussed the need to restructure the agreements with lenders and that the soybean harvest was down substantially from earlier

projections. Seaboard President and CEO Bresky, Seaboard employee Dannov, and Seaboard General Counsel Zach Holden attended the meeting from Kansas. Seaboard employee Guzman attended from Montevideo, Uruguay and Seaboard employee Cummings attended from Isle of Man.

51.    In June and July of 2016, Seaboard employees Guzman and Dannov discussed Cereoil's shortage of grain.

52.    Unbeknownst to HSBC at the time, on or about June 21, 2016 and July 19, 2016, even though Guzman and Dannov acknowledged the shortage of grain, Cereoil and Seaboard executed two new contracts for shipment of soybeans from Cereoil to Seaboard.

53.    When it executed the June 2016 and July 2016 contracts, Seaboard knew that Cereoil did not have enough soybeans to cover both these new contracts and the April 2016 contract that had been previously assigned to HSBC.

54.    The new contracts required a total of 40,000 tons of soybeans, which is exactly the same quantity of soybeans required by the April 2016 contract that had been assigned to HSBC.

55.    Both the new contracts between Cereoil and Seaboard had shipment dates *prior* to the shipment date of the April 2016 contract that had been assigned to HSBC, even though Cereoil and Seaboard entered into the new contracts *after* the April 2016 contract assigned to HSBC.

56.    In June 2016, HSBC collected $14,037,320.37 from other export contracts. Although Seaboard knew of the grain shortage and the incapacity to comply with the

contract and letter of credit assigned to HSBC, it failed to prevent the bank's loss and mislead HSBC to release these funds instead of using them to cancel the obligations toward the bank.

57.     On or about August 5, 2016 Seaboard employee Guzman and Cereoil executive Rosina Drever assured HSBC that the price of grain contract assigned to HSBC would be fulfilled, despite knowing that the shortage of grain and new contracts with earlier shipment dates would make fulfillment of the contract assigned to HSBC impossible.

58.     Had HSBC known the August 5, 2016 representations were false, it would have refused to release Lucia Viana from her personal guarantee on September 7, 2016.

59.     Unbeknownst to HSBC at the time, Seaboard caused the grain remaining in Cereoil's possession to ship to Seaboard under the new grain contracts between Cereoil and Seaboard that were not assigned to HSBC, intentionally benefiting itself to the detriment of HSBC.

60.     Upon information and belief, Seaboard did not pay the purchase price for the grain it received in cash to Cereoil, but instead compensated Cereoil for the grain it received by exercising a setoff against another debt Cereoil owed to Seaboard.

61.     Upon information and belief, after Seaboard received the soybeans Cereoil shipped under the new grain contracts that were not assigned to HSBC, Seaboard employee Dannov suggested that Cereoil file for bankruptcy.

62.     After Seaboard received its payment, Dannov and Cummings, the two Seaboard employees appointed by Seaboard as Cereoil directors, filed bankruptcy

proceedings for Cereoil on September 9, 2016.

63.    Because of Seaboard's actions, Cereoil defaulted on its obligations to HSBC.

64.    As a direct and proximate result of Seaboard's actions, Cereoil's loan obligation to HSBC the loan principal of $10 million is wholly unsatisfied. Interest on the loan has grown to more than $3.2 million and the per diem interest rate is $1,649.22.

65.    HSBC learned of Seaboard's false statements and tortious conduct in April 2018, when it received Seaboard emails disclosed as part of the Cereoil bankruptcy proceeding in Uruguay.

66.    On or about August 16, 2016, Guzman encouraged Cereoil's directors not to meet Cereoil's obligations to HSBC. Guzman's email advised and instructed Cereoil's directors to act to avoid risk to Seaboard by not shipping the remaining soybeans under the Seaboard contract that had been assigned to HSBC. HSBC did not learn of these communications until April 2018.

67.    Guzman's August 16, 2016 email to Cereoil directors Dannov, Cummings, and Shanon James stated:

> Hello all, I want to suggest not to export through to Seaboard the last vessel that Cereoil has for this season; my concern is that since we have a forward contract with Seaboard awarded to HSBC which at the same time is supported by a LC, Seaboard could face a legal problem with the bank when they realize that there is not more grain to fulfil this contract. As you know currently Cereoil only has around 21/23 K MT of beans, that once exported will not be used to pay HSBC but to sell K MT by the end of this month or beginning of September and the proceeds will be used to pay warrants and farmers. Once the stock of beans is finished, Cereoil will have to tell the bank that there is not more volume left for export and for that

reason the company cannot fulfill their $ 10 million contract. The bank will then inquire if Seaboard had the knowledge that there was [sic] no more gains [sic] for export. We cannot state that Seaboard was not acquainted with the situation since it is not believable. It is not possible that Seaboard is not aware of this situation, being a shareholder in Cereoil.

Additionally, if we export this last ship through Seaboard, the bank will identify who the importer is. The contract and the LC that supports the contract were assigned to HSBC and this establishes that once the beans are exported, Seaboard will pay the grain through a deposit in HSBC. I just want to call attention to avoid the risk of SEB before continuing with this latest export. We attach the following documents: Export contract signed between Cereoil and Seaboard. LC issued by Seaboard; Notification where Seaboard is duly notified that the product of this contract must be deposited with HSBC – Uruguay; Apostille certifying SEB signatures in the notification."

68.     Upon information and belief, Seaboard later transferred Guzman to a new position and he disappeared from Uruguay after the Cereoil bankruptcy proceedings began.

**The Tolling Agreement**

69.     On September 6, 2019, Seaboard agreed to toll the statute of limitations with respect to HSBC's claims against Seaboard for a period commencing on September 9, 2019.

70.     As of the filing date of this Complaint, the tolling agreement has not expired.

## COUNT I—BREACH OF CONTRACT

71.     HSBC realleges and incorporates by reference the foregoing and following paragraphs as if set forth herein.

72.     Seaboard entered into the Inducement Letter attached as Exhibit A, which is valid, enforceable, and supported by sufficient consideration.

73.     Both parties intended for Seaboard to be bound by the covenants in the Inducement Letter.

74.     HSBC fully performed all of its duties and obligations under the Inducement Letter, and all conditions precedent to bringing this action have been satisfied.

75.     Seaboard breached and continues to breach the Inducement Letter by failing to monitor Cereoil's financial position in a timely manner, failing to maintain its financial, operational and trade relationship with Cereoil as it had in the past when it was not an owner of Cereoil and did not have directors and a key officer stationed at Cereoil, and failing to support, rather than interfere with, Cereoil's payment of HSBC as a creditor.

76.     Seaboard's actions have caused and will continue to cause damages to HSBC for breach of contract in an amount in excess of $75,000.

WHEREFORE, HSBC respectfully requests that the Court enter judgment in its favor on this Count; for the award of compensatory damages in an amount yet to be determined but in excess of $75,000; for all costs, expenses, and attorney's fees incurred by HSBC in bringing this action in such an amount that is fair and reasonable; for pre and post judgment interest; and for such other relief as the Court deems just and equitable.

## COUNT II – BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

77.     HSBC realleges and incorporates by reference the foregoing and following

paragraphs as if set forth herein.

78.     A covenant of good faith and fair dealing is implied in all contracts.

79.     Seaboard breached the covenant of good faith and fair dealing by failing to advise and inform HSBC of detrimental financial information before modifying its financial relationship with Cereoil, failing to disclose Cereoil's detrimental financial condition before renegotiating the HSBC contract in April 2016, and, for the benefit of Seaboard and detriment of HSBC, intentionally diverting Cereoil grain that could have been used to fulfill the obligations under the HSBC contract to Seaboard, when Seaboard knew of Cereoil's financial condition.

80.     As a result of Seaboard's actions, Seaboard violated the implied covenant of good faith and fair dealing contained in the contract that is the subject of this action, and as a result of such violation, HSBC is entitled to damages as requested.

81.     HSBC incurred significant damages as a result of Seaboard's breach when it extended Cereoil credit and restructured Cereoil's debt based on Seaboard's actions, as well as when Seaboard diverted grain that could have been used to satisfy Cereoil's debts to HSBC for Seaboard's own benefit.

WHEREFORE, HSBC respectfully requests that the Court enter judgment in its favor on this Count; for the award of compensatory damages in an amount yet to be determined but in excess of $75,000; for all costs, expenses, and attorney's fees incurred by HSBC in bringing this action in such an amount that is fair and reasonable; for pre and post judgment interest; and for such other relief as the Court deems just and equitable.

## COUNT III – PROMISSORY ESTOPPEL

82.     HSBC realleges and incorporates by reference the foregoing and following paragraphs as if set forth herein.

83.     Seaboard promised HSBC to monitor Cereoil's financial position in a timely manner, maintain its financial, operational and trade relationship with Cereoil, tell HSBC what it knew about Cereoil's financial condition when it sought to renegotiate the collateral and guarantees in April 2016, and give HSBC notice in time to avoid future advances to Cereoil when Seaboard had reason to believe that Cereoil could not pay.

84.     Seaboard expected or should have expected HSBC to rely on Seaboard's promises.

85.     HSBC reasonably relied on Seaboard's promise, which resulted in injustice when Seaboard failed to monitor Cereoil's financial position in a timely manner, failed to maintain its financial, operational and trade relationship with Cereoil, failed to tell HSBC what it knew about Cereoil's financial condition when it sought to renegotiate the collateral and guarantees in April 2016, and failed to give HSBC notice in time to avoid future advances to Cereoil when Seaboard had reason to believe that Cereoil could not pay.

WHEREFORE, HSBC respectfully requests that the Court enter judgment in its favor on this Count; for the award of compensatory damages in an amount yet to be determined but in excess of $75,000; for all costs, expenses, and attorney's fees incurred by HSBC in bringing this action in such an amount that is fair and reasonable; for pre and post judgment interest; and for such other relief as the Court deems just and equitable.

## COUNT IV – UNJUST ENRICHMENT

86.     HSBC realleges and incorporates by reference the foregoing and following paragraphs as if set forth herein.

87.     HSBC conferred a benefit on Seaboard when it restructured its debt with Cereoil from being backed by a contract between Cereoil and Amaggi to being back by a contract between Cereoil and Seaboard.

88.     Seaboard realized the benefit of restructuring Cereoil's debt when Cereoil and Seaboard diverted grain that could have satisfied Cereoil's obligations to HSBC to a different contract between Seaboard and Cereoil that HSBC did not have an assignment of credit and a  letter of credit.

89.     Seaboard accepted and retained the benefit under circumstances that are inequitable or unjust because it intentionally diverted grain to a different contract in order to benefit itself, rather than a contract that would be used to fulfil Cereoil's debt to HSBC.

WHEREFORE, HSBC respectfully requests that the Court enter judgment in its favor on this Count; for the award of compensatory damages in an amount yet to be determined but in excess of $75,000; for all costs, expenses, and attorney's fees incurred by HSBC in bringing this action in such an amount that is fair and reasonable; for pre and post judgment interest; and for such other relief as the Court deems just and equitable.

## COUNT V – FRAUD

90.     HSBC realleges and incorporates by reference the foregoing and following paragraphs as if set forth herein.

91.    Seaboard made false statements of existing and material fact regarding the financial health of Cereoil, the availability of grain, HSBC's ability to collect on an export contract between Cereoil and Seaboard, and the relative collectability risks of other types of collateral.

92.    Guzman, a Seaboard employee and agent, represented Cereoil's financial health and current financial performance when he told HSBC in April 2016 that it should increase its credit loss exposure to Cereoil to $10,000,000.

93.    Guzman represented to HSBC in April 2016 that it would be advantageous at the time to guarantee the $10,000,000 by an assignment of the April 14, 2016 export contract between Cereoil and Seaboard because of the current financial position of Cereoil and availability of sufficient grain to fulfil the contract. Seaboard provided this information to Guzman, and intended for Guzman to convey it to HSBC.

94.    Guzman represented that the contract between Cereoil and Seaboard had fewer collectability concerns than other types of collateral, including a security interest in an export contract with the Amaggi Group and a personal guarantee by Lucia Viana, based on Cereoil's then-current financial position, the availability of grain, and the then-current financial positions of the Amaggi Group and Lucia Viana.

95.    Seaboard knew the representations to be false or made the representations recklessly without knowledge concerning their falsity.

96.    Seaboard made the representations intentionally for the purpose of inducing HSBC to act upon them by increasing its credit loss exposure to Cereoil, replacing the assignment of the Amaggi contract with the April 2016 contract between Cereoil and

Seaboard, and releasing Lucia Viana from her personal guarantee.

97.    HSBC reasonably relied on the information because of promises Seaboard made to HSBC in the Inducement Letter, and because Seaboard had access to insider information that HSBC could not access, including information about Cereoil's financial health and the quantity of soybeans that were available for shipment.

98.    In reliance on Seaboard's statements HSBC increased its credit loss exposure to Cereoil, replaced the assignment of the Amaggi contract with the April 2016 contract between Cereoil and Seaboard, and released Lucia Viana from her personal guarantee on September 7, 2016.

99.    HSBC suffered damages because of Seaboard's representations after Seaboard diverted the remaining soybeans to ship under a different contract that HSBC did not have an interest in and, after the grain shipped to Seaboard, Seaboard filed bankruptcy proceedings for Cereoil.

100.   HSBC did not discover the facts underlying its fraud claim until after a reimbursement action was filed against Seaboard in Uruguay in 2018.

WHEREFORE, HSBC respectfully requests that the Court enter judgment in its favor on this Count; for the award of compensatory damages in an amount yet to be determined but in excess of $75,000; for all costs, expenses, and attorney's fees incurred by HSBC in bringing this action in such an amount that is fair and reasonable; for pre and post judgment interest; and for such other relief as the Court deems just and equitable.

### COUNT VI – NEGLIGENT MISREPRESENTATION

101.   HSBC realleges and incorporates by reference the foregoing and following

paragraphs as if set forth herein.

102.   This cause of action is brought in the alternative to Count V – Fraud.

103.   As detailed above, Seaboard provided false information to HSBC and failed to exercise reasonable care or competence in obtaining and communicating the false information to HSBC.

104.   Seaboard intended for the false information that it supplied to HSBC to guide and influence it to act upon it by increasing its credit loss exposure to Cereoil, replacing the assignment of the Amaggi contract with the April 2016 contract between Cereoil and Seaboard, and releasing Lucia Viana from her personal guarantee.

105.   HSBC reasonably relied on Seaboard's negligently-issued false statement and, as a result, sustained significant damages.

106.   HSBC did not discover the facts underlying its negligent misrepresentation claim until after a reimbursement action was filed against Seaboard in Uruguay in 2018.

WHEREFORE, HSBC respectfully requests that the Court enter judgment in its favor on this Count; for the award of compensatory damages in an amount yet to be determined but in excess of $75,000; for all costs, expenses, and attorney's fees incurred by HSBC in bringing this action in such an amount that is fair and reasonable; for pre and post judgment interest; and for such other relief as the Court deems just and equitable.

## COUNT VII – FRAUD BY CONCEALMENT

107.   HSBC realleges and incorporates by reference the foregoing and following paragraphs as if set forth herein.

108.   Seaboard had knowledge of material facts that HSBC did not have,

including Cereoil's financial position in 2016, the quantity of grain available to Cereoil in 2016, the June and July 2016 soybean contracts between Seaboard and Cereoil, and Dannov and Cummings decision to file for Cereoil's bankruptcy on September 9, 2016.

109.   HSBC could not have discovered these facts through reasonable diligence because it did not have access to internal Seaboard and Cereoil information and communications or Cereoil board meeting minutes, until they were disclosed to HSBC in August 2018.

110.   Seaboard was under an obligation to communicate Cereoil's financial position, the insufficient quantity of grain, the June and July 2016 soybean contracts, and the impending decision to file for Cereoil's bankruptcy to HSBC because of the representations in the Inducement Letter and contractual relationship that required disclosure.

111.   Seaboard was also under an obligation to disclose Cereoil's precarious financial position and the lack of grain because it knew that Guzman and Cereoil provided inaccurate information to HSBC in April 2016 regarding Cereoil's financial health, the availability of grain, that grain existed and had been purchased from local producers or produced in Cereoil's fields, and that the grain would be used as a priority for the price of grain contract that had been transferred to HSBC.

112.   Seaboard also knew that Guzman and Drever and inaccurately assured HSBC on August 5, 2016 that the price of grain contract assigned to HSBC would be fulfilled.

113.   Seaboard learned or knew that the information provided to HSBC was

21

inaccurate and intentionally did not disclose it to HSBC.

114.     Seaboard had a duty to correct material misrepresentations made by Cereoil employees and its representative, Guzman, because it gained an unfair advantage by concealing the information about the financial health of Cereoil and availability of grain to cover the contract assigned to HSBC.

115.     HSBC justifiably relied on Seaboard to communicate the material facts to it because of the Inducement Letter, Seaboard's internal access to information, and Seaboard's knowledge of Guzman, Drever, and Cereoil's statements about the financial health of Cereoil and availability of grain.

116.     HSBC sustained significant damages as a result of Seaboard's failure to communicate the material facts to HSBC after Seaboard diverted the remaining soybeans to ship under a different contract that HSBC did not have an interest in and, after the grain shipped to Seaboard, Seaboard filed bankruptcy proceedings for Cereoil.

117.     HSBC did not discover the facts underlying its fraud by concealment claim until after a reimbursement action was filed against Seaboard in Uruguay in 2018.

WHEREFORE, HSBC respectfully requests that the Court enter judgment in its favor on this Count; for the award of compensatory damages in an amount yet to be determined but in excess of $75,000; for all costs, expenses, and attorney's fees incurred by HSBC in bringing this action in such an amount that is fair and reasonable; for pre and post judgment interest; and for such other relief as the Court deems just and equitable.

## **DEMAND FOR JURY**

Plaintiff hereby demands a jury on all issues so triable.

Respectfully submitted,

FOULSTON SIEFKIN LLP

*s/ Anthony F. Rupp*
Anthony F. Rupp, KS #11590
Sarah C. Otto, KS #27954
Foulston Siefkin LLP
32 Corporate Woods, Suite 600
9225 Indian Creek Parkway
Overland Park, Kansas 66210-2000
913.498.2100
866.347.1472 FAX
trupp@foulston.com
sotto@foulston.com

ATTORNEYS FOR PLAINTIFF