## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

HSBC BANK (URUGUAY) S.A.,

        Plaintiff,

v.

SEABOARD CORPORATION,

        Defendant.

Case No. 21-cv-2435-DDC-TJJ

## MEMORANDUM AND ORDER

This case arises from an international commercial dispute that's turned into a civil procedure battle royale.

A Kansas corporation, defendant Seaboard Corporation, purchased a minority ownership interest in Cereoil Uruguay S.A., a Uruguayan company. Cereoil's bank, plaintiff HSBC Bank (Uruguay) S.A., wanted assurances from defendant before it granted Cereoil a new credit facility. Defendant complied, providing plaintiff with a "comfort letter" to encourage plaintiff to grant Cereoil the credit facility. A few months later, defendant allegedly persuaded plaintiff to restructure Cereoil's debt and accept—as guarantee for the debt—an assignment of a soybean sale agreement between Cereoil and defendant. But Cereoil ran out of soybeans. Instead of shipping Cereoil's remaining soybeans under the contract assigned to plaintiff, defendant allegedly caused Cereoil to ship the soybeans to defendant itself. Then, defendant forced Cereoil to file for bankruptcy protection in Uruguay. In that bankruptcy proceeding, Cereoil's bankruptcy Trustee has asserted two actions against defendant. They seek to force return of

property from defendant to the Cereoil bankruptcy estate and make defendant liable to Cereoil's creditors.

Plaintiff then commenced this action against defendant.  In it, plaintiff asserts seven claims:  (1) breach of contract, (2) breach of the covenant of good faith and fair dealing, (3) promissory estoppel, (4) unjust enrichment, (5) fraud, (6) negligent misrepresentation, and (7) fraud by concealment.  Defendant has moved to dismiss, invoking two independent doctrines and two parts of Rule 12:  forum non conveniens, abstention, Fed. R. Civ. P. 12(b)(7), and Fed. R. Civ. P. 12(b)(6).  Doc. 13.  This Order decides the Motion to Dismiss.  In summary form, the court dismisses plaintiff's claims for breach of contract and breach of the covenant of good faith and fair dealing.  Each claim fails to state a claim.  The court also concludes that plaintiff's unjust enrichment claim is untimely and dismisses it as well.  Separately, the court dismisses plaintiff's tort claims under the forum non conveniens doctrine.  But plaintiff's promissory estoppel claim survives.

The court explains the reasoning for these decisions, below.  But first, it addresses defendant's separate Motion to Take Judicial Notice (Doc. 15).

## I.      Motion to Take Judicial Notice (Doc. 15)

The court begins with a threshold matter—defendant's request for judicial notice of various documents.

A federal court may take judicial notice of "a fact that is not subject to reasonable dispute" if it:  (1) "is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  The court must take judicial notice if a party requests it and supplies the court with the requisite information.  Fed. R. Evid. 201(c)(2).  When ruling a motion

to dismiss, a court may consider facts subject to judicial notice without converting the motion to dismiss into a motion for summary judgment. *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006).

Invoking Fed. R. Evid. 201(b)(2), defendant asks that the court take judicial notice of documents from Cereoil's bankruptcy proceeding in Uruguay and English translations of those documents. Specifically, defendant asks the court to take judicial notice of:

- Exhibit B-1 (Doc. 14-3): Uruguayan Bankruptcy Trustee's March 20, 2018, Action (Claw-Back Action) in Spanish,

- Exhibit B-2 (Doc. 14-4): Bankruptcy Trustee's Claw-Back Action, English Translation of Doc. 14-3,

- Exhibit B-3 (Doc. 14-5): Defendant's Response to Trustee's March 20, 2018, Action (Claw-Back Action) in Spanish,

- Exhibit B-4 (Doc. 14-6): Defendant's Response to Claw-Back Action, English Translation of Doc. 14-5,

- Exhibit B-5 (Doc. 14-7): Bankruptcy Trustee's April 27, 2018, Action (Culpability Action) in Spanish,

- Exhibit B-6 (Doc. 14-8): Bankruptcy Trustee's Culpability Action, English Translation of Doc. 14-7,

- Exhibit B-7 (Doc. 14-9): Defendant's Response to April 27, 2018, Action (Culpability Action) in Spanish,

- Exhibit B-8 (Doc. 14-10): Defendant's Response to Culpability Action, English Translation of Doc. 14-9.

Doc. 15 at 2. Plaintiff does not oppose defendant's motion. Doc. 20 at 1.

Defendant asserts that Exhibits B-1, B-3, B-5, and B-7 are copies of files made in related court proceedings in Uruguay. Each one is written in Spanish. Defendant "only seeks judicial notice of these pleadings in order to show the claims and defenses that have been raised in the Uruguayan bankruptcy proceedings." Doc. 15 at 4–5. The court agrees that it properly may take

judicial notice of these filings.  *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172

(10th Cir. 1979) (holding that federal courts may take notice of proceedings from other courts if

those proceedings have a direct relation to matters at issue in the current case).  And the court

notes that the "documents may only be considered to show their contents, not to prove the truth

of matters asserted therein."  *Tal*, 453 F.3d at 1264 n.24 (quotation cleaned up).

Defendant also asserts that Exhibits B-2, B-4, B-6, and B-8 are English language

translations of the filings from the Uruguayan bankruptcy proceeding.  Defendant submitted an

Affidavit from Sandra González—an attorney fluent in Spanish and English who regularly

supervises translation of Uruguayan court documents from Spanish to English.  *See* Doc. 14-2

(González Aff.).  This Affidavit confirmed that the English language translations of the Spanish

documents are true and accurate.  *Id.* at 2–3 (González Aff. ¶¶ 5–14).  The parties do not dispute

the authenticity of the original documents or the accuracy of the translations.  The court agrees

that it may take judicial notice of the translations.  *See Strobel v. Rusch*, 431 F. Supp. 3d 1315,

1324, 1324 n.2 (D.N.M. 2020) (taking judicial notice of English translation of Partnership

Agreement written in German where parties did not dispute authenticity of Partnership

Agreement or accuracy of translation).

The court thus grants defendant's Motion to Take Judicial Notice (Doc. 15).

## II.      Factual and Procedural Background

As it must at the motion to dismiss stage, the court accepts plaintiff's "well-pleaded facts

as true, view[s] them in the light most favorable to [plaintiff], and draw[s] all reasonable

inferences from the facts" in plaintiff's favor.  *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272,

1281 (10th Cir. 2021).

Plaintiff here is a Uruguayan bank.  Doc. 2 at 2, 3 (Compl. ¶¶ 5, 9).  Cereoil purchases

and exports Uruguayan grain.  *Id.* at 3 (Compl. ¶ 10).  Before defendant purchased its stake in

Cereoil, plaintiff provided financing to Cereoil.  These arrangements included:  a credit facility

backed by the personal guarantees of Lucia Viana, William Johnson, and Nolston S.A.; other

personal guarantees; and warrants, third-party documents, and export contracts.  *Id.* (Compl. ¶

13).  Viana and Johnson previously owned Cereoil.  *Id.* (Compl. ¶ 11).

 In May 2015, defendant Seaboard acquired a 45% ownership interest in Cereoil from

Viana.  *Id.* (Compl. ¶ 12).  The terms of defendant's purchase gave it the right to elect two

directors of Cereoil and the right to appoint Cereoil's Chief Financial Officer (CFO).  *Id.* at 3–4

(Compl. ¶ 14).  Defendant employed these two Cereoil directors and the CFO and they served at

defendant's behest.  *Id.* at 4, 8 (Compl. ¶ 15, 42).  Also, defendant appointed two Cereoil

directors:  David Dannov and Gail Cummings.  *Id.* at 8 (Compl. ¶ 41).  In April 2016, defendant

installed Alejandro Guzman Bernal as CFO of Cereoil in Uruguay.  *Id.* at 6 (Compl. ¶ 26, 28).

### *The Comfort Letter*

When defendant acquired its interest in Cereoil, plaintiff sought to change its banking

relationship with Cereoil.  *Id.* at 4 (Compl. ¶ 16).  Previously, former Cereoil owner Viana

personally had guaranteed Cereoil's debts to plaintiff.  *Id.*  But defendant, a new Cereoil owner,

gave plaintiff no such guarantee.  *Id.*  So, before plaintiff extended credit to Cereoil under its new

ownership structure, plaintiff and defendant negotiated.  *Id.* (Compl. ¶ 17).  And, ultimately,

defendant provided plaintiff with a Comfort Letter.[1]  *Id.* (Compl. ¶ 18).

---

[1]      Plaintiff calls this document an "Inducement Letter."  Defendant calls it a "Comfort Letter."  The
document itself refers to the letter as a "Comfort Letter."  *See* Doc. 2-1 at 2.  While the court understands
that it must view the Complaint's allegations in the light favoring plaintiff—the non-moving party—that
standard doesn't permit counsel to rename a document that the parties already have named.  The court
thus refers to the letter as a Comfort Letter.

Defendant voluntarily signed the Comfort Letter on July 13, 2015.  *Id.*  Steven J. Bresky, defendant's President and CEO, signed the letter.  *Id.* at 5 (Compl. ¶ 21).  Defendant sent the Comfort Letter from its Kansas address to plaintiff in Montevideo, Uruguay.  *Id.* (Compl. ¶ 20). And the Comfort Letter specifically defines Cereoil as defendant's subsidiary.  *Id.* (Compl. ¶ 22).

Defendant signed the letter for the agreed and recognized purpose of inducing plaintiff to grant a credit facility to Cereoil and Nolston S.A. as much as $13 million.[2]  *Id.* at 4 (Compl. ¶ 18).  The Comfort Letter explicitly represents the following:

> [Defendant] intends to maintain its present interest in [Cereoil and Nolston] as well as its financial, operational and trade relationships with them.

> [Defendant] confirms to [plaintiff] that it has been and currently is our time honoured and continuing policy to have our affiliates, partly or wholly owned, meet all of their financial and contractual obligations, as approved by such affiliates' boards of directors.  Nonetheless by accepting this letter, you acknowledge that this letter is not a guarantee, but rather merely states our intention to monitor [Cereoil and Nolston's] financial condition in a timely manner.

> [Defendant] appreciates this letter will be considered a further inducement towards [plaintiff] granting the [$13 million] Facility to [Cereoil and Nolston].

*Id.* at 4–5 (Compl. ¶ 19); Doc. 2-1 at 2 (emphasis omitted).  Also, the Comfort Letter assures plaintiff that defendant intended the letter to apply broadly to all financial accommodations— "credit or banking facilities, loans or advances or other financial accommodation in any form whatsoever"—that plaintiff may extend to Cereoil.  Doc. 2 at 5 (Compl. ¶ 23); Doc. 2-1 at 2. The Comfort Letter also provides that plaintiff granted the credit facility "considering [defendant's] ownership in" Cereoil and Nolston.  Doc. 2 at 6 (Compl. ¶ 24); Doc. 2-1 at 2.

### *The Replacement*

---

[2]      Luciana Viana and William Johnson own Nolston S.A.  Doc. 2 at 3 (Compl. ¶ 13).  The Comfort Letter refers to Cereoil and Nolston as "Subsidiaries."  *Id.* at 4 (Compl. ¶ 18).  The Comfort Letter discusses both subsidiaries, but the claims in this action focus on Cereoil.

As of April 2016, plaintiff's credit loss exposure to Cereoil was less than $4,500,000. Doc. 2 at 6 (Compl. ¶ 30). Plaintiff secured this credit with a variety of collateral: personal guarantees, warrants, and assignment of export contracts between Cereoil and the Amaggi Group, a Brazilian commodities company. *Id.* In April 2016, Cereoil CFO Guzman negotiated with plaintiff about the terms of new credit facilities for Cereoil. *Id.* (Compl. ¶ 31). Guzman functioned as defendant's eyes and ears inside Cereoil and exerted defendant's strategic control over Cereoil. *Id.* (Compl. ¶ 29).

Guzman proposed that plaintiff renew Cereoil's financing up to $10 million, guaranteed by an assignment of a grain sale agreement for soybeans between Cereoil and defendant. *Id.* at 6–7 (Compl. ¶ 32). Cereoil and defendant had signed the grain sale agreement on April 14, 2016, for 40,000 tons of soybeans. *Id.* The Bank of Nova Scotia-Canada had issued a letter of credit for the grain sale of up to $12.8 million. *Id.* And the grain sale contract listed a shipment date of October 2016. *Id.* at 9 (Compl. ¶ 49).

Guzman told plaintiff that defendant and Cereoil wanted to change the backing for plaintiff's credit facility with Cereoil because he had concerns about collectability risks with the Amaggi Group. *Id.* at 7 (Compl. ¶ 33). Guzman explained that backing the credit facility with the Cereoil/defendant grain sale agreement was stronger than backing the credit facility with the Amaggi contract. *Id.* (Compl. ¶ 34). Relying on defendant's representations, by Guzman, and relying on the Comfort Letter, plaintiff agreed to replace the Amaggi contract assignment and, instead, accepted the Cereoil/defendant grain sale agreement, backed by a letter of credit, as guarantee for the credit facility. *Id.* (Compl. ¶ 35). And plaintiff, again relying on defendant's representations and the Comfort Letter, renewed Cereoil's financing up to $10 million. *Id.*

(Compl. ¶ 36).  Also, in September 2016, plaintiff released Viana (the former Cereoil owner) from her personal guarantee of the credit facility.  *Id.* (Compl. ¶ 37).

On April 22, 2016, Cereoil assured plaintiff that the soybeans referred to in the Cereoil/defendant grain sale agreement already existed.  *Id.* at 8 (Compl. ¶ 38).  And Cereoil assured plaintiff that it would use the soybeans "as a priority" for the grain sale agreement between Cereoil and defendant that the parties had transferred to plaintiff.  *Id.*

### Trouble for Cereoil:  Soybean Shortage

But plaintiff didn't know that Cereoil actually lacked enough soybeans to meet its delivery obligation to defendant.  *Id.* at 9 (Compl. ¶ 46).  Indeed, Cereoil's board of directors met on April 5, 2016, to discuss Cereoil's "delicate financial situation."  *Id.* (Compl. ¶ 48).  Bresky (Seaboard President and CEO) and Dannov (Cereoil director and Seaboard employee) attended this meeting from Kansas.  *Id.* (Compl. ¶ 48).  Guzman (Cereoil CFO) and Cummings (Cereoil director and Seaboard employee) attended the meeting remotely via video conference.  *Id.*  At the meeting, the board discussed potential sales between defendant and Cereoil to create liquidity, including soybean contracts.  *Id.*

The Cereoil board met again on May 9, 2016.  *Id.* at 9–10 (Compl. ¶ 50).  Bresky, Dannov, and Seaboard General Counsel Zach Holden attended the meeting from Kansas, Guzman attended from Uruguay, and Cummings attended from the Isle of Man.  *Id.*  The board discussed the need to restructure lender agreements.  *Id.*  They also discussed a poor soybean harvest—the numbers fell below earlier projections.  *Id.*

In June and July of 2016, Guzman and Dannov again discussed Cereoil's grain shortage.  *Id.* at 10 (Compl. ¶ 51).  Nonetheless, on June 21, 2016, and July 19, 2016, Cereoil and defendant executed two new contracts for shipment of soybeans from Cereoil to defendant.  *Id.*

(Compl. ¶ 52).  Plaintiff didn't know about the new contracts.  *Id.*  These new contracts required a total of 40,000 tons of soybeans.  *Id.* (Compl. ¶ 54).  The April 2016 contract which the parties had assigned to plaintiff also required 40,000 tons of soybeans.  *Id.*  And the new contracts between Cereoil and defendant had shipment dates before the shipment date of plaintiff's April 2016 contract.  *Id.* (Compl. ¶ 55).  But defendant knew Cereoil didn't have enough grain to cover the new contracts *and* the April 2016 contract assigned to plaintiff.  *Id.* (Compl. ¶ 53).

### *Failure to Perform:  Diverting Grain*

On August 5, 2016, Guzman and Cereoil executive Rosina Drever assured plaintiff that Cereoil and defendant would fulfill the price of grain contract assigned to plaintiff.  *Id.* at 11 (Compl. ¶ 57).  But Guzman and Drever knew that the grain shortage and the new contracts with earlier shipment dates would make it impossible to fulfill the contract assigned to plaintiff.  *Id.*  On August 16, 2016, Guzman encouraged Cereoil's directors not to meet Cereoil's obligations to plaintiff.  *Id.* at 12 (Compl. ¶ 66).  Specifically, Guzman advised Cereoil to avoid risk to defendant by declining to ship the remaining soybeans under the April 2016 contract assigned to plaintiff.[3]  *Id.*  Guzman wrote in an email, "my concern is that since we have a forward contract with Seaboard awarded to HSBC which at the same time is supported by a LC, Seaboard could face a legal problem with the bank when they realize that there is not more grain to fulfil[l] this contract."  *Id.* at 12–13 (Compl. ¶ 67).

Defendant caused the soybeans remaining in Cereoil's possession to ship to defendant under the new grain contracts instead of fulfilling the April 2016 contract assigned to plaintiff.  *Id.* at 11 (Compl. ¶ 59).  Plaintiff alleges that defendant did this intentionally, to benefit defendant and to plaintiff's detriment.  *Id.*  And defendant paid Cereoil by offsetting another debt

---

[3]     Plaintiff learned of Guzman's instructions to Cereoil in April 2018, when the bankruptcy proceeding disclosed defendant's communications.  Doc. 2 at 12 (Compl. ¶¶ 65, 66).

that Cereoil owed it, rather than paying Cereoil in cash. *Id.* (Compl. ¶ 60). After defendant received the soybeans from Cereoil under the new grain contracts, Dannov suggested that Cereoil file for bankruptcy. *Id.* (Compl. ¶ 61). Dannov and Cummings filed Cereoil's bankruptcy petition in Uruguay on September 9, 2016. *Id.* at 11–12 (Compl. ¶ 62). Defendant transferred Guzman to a new position after the bankruptcy proceeding began, and he left Uruguay. *Id.* at 13 (Compl. ¶ 68).

Ultimately, Cereoil defaulted on its obligations to plaintiff. *Id.* at 12 (Compl. ¶ 63). Cereoil's $10 million obligation to plaintiff remains wholly unsatisfied. *Id.* (Compl. ¶ 64).

### *Uruguayan Bankruptcy Proceeding*

On March 20, 2018, Cereoil's bankruptcy Trustee[4] filed an action against defendant—commonly called a "Claw-Back Action." Doc. 14-4 at 2. "The claw-back action is a remedy aimed at returning property to the bankruptcy estate." *Id.* at 6. The action seeks "to protect the interests of all bankruptcy creditors[.]" *Id.*

On April 27, 2018, Cereoil's bankruptcy Trustee filed another action against defendant. This action—defendant calls it a "Culpability Action"—alleges that defendant's financing of Cereoil's operations left creditors at a disadvantage. Doc. 14-8 at 5. And the Culpability Action proposes that defendant and its subsidiaries "cover the entire equity deficit of [Cereoil] to the benefit of creditors." *Id.* at 30.

### *Procedural History*

Plaintiff filed this lawsuit on September 30, 2021. Doc. 2 (Compl.). The Complaint asserts seven claims against defendant: (1) breach of contract; (2) breach of covenant of good

---

[4]      Uruguayan bankruptcy courts use the term Receiver rather than Trustee. In this Order, the court uses the familiar term Trustee.

faith and fair dealing; (3) promissory estoppel; (4) unjust enrichment; (5) fraud; (6) negligent misrepresentation; and (7) fraud by concealment.  Doc. 2 at 13–22 (Compl. ¶¶ 71–117).

Defendant filed its Motion to Dismiss or Stay on December 2, 2021.  Doc. 13.  Defendant asserts four independent grounds for dismissal or stay:  (1) forum non conveniens; (2) abstention; (3) failure to join a necessary and indispensable party under Fed. R. Civ. P .12(b)(7); and (4) failure to state a claim under Fed. R. Civ. P. 12(b)(6).  The court examines each ground, in turn, below.

The court's analysis begins in Part III, defendant's addressing, first, forum non conveniens arguments.  The court starts there because defendant opened with this argument.  The court concludes that this doctrine warrants dismissal of plaintiff's tort claims, but not its contract claims.  Consequently, Part IV addresses defendant's abstention arguments, as they apply to plaintiff's contract claims.  Finding that neither abstention argument should prevail, Parts V and VI decide defendant's arguments relying on two aspects of the Federal Rules of Civil Procedure. Plaintiff's first rule-based argument fails, but its second argument prevails in part.

## III.   Forum Non Conveniens

Defendant's forum non conveniens argument contends the court should dismiss this action in favor of a more convenient one—one in Uruguay.  The court's analysis of this argument begins, below, with the governing legal standard.

### A.      Legal Standard

"The *forum non conveniens* determination is committed to the sound discretion of the trial court."  *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257 (1981).  "'The central purpose of any *forum non conveniens* inquiry is to ensure that the trial is convenient.'"  *Gschwind v. Cessna*

*Aircraft Co.*, 161 F.3d 602, 605 (10th Cir. 1998) (quoting *Piper*, 454 U.S. at 256) (brackets omitted).  The Supreme Court has explained:

> when an alternative forum has jurisdiction to hear a case, and when trial in the chosen forum would establish oppressiveness and vexation to a defendant out of all proportion to plaintiff's convenience, or when the chosen forum is inappropriate because of considerations affecting the court's own administrative and legal problems, the court may, in the exercise of its sound discretion, dismiss the case, even if jurisdiction and proper venue are established.

*Am. Dredging Co. v. Miller*, 510 U.S. 443, 447–48 (1994) (quotation cleaned up).  "The doctrine of *forum non conveniens* permits a court to dismiss a case when an adequate alternative forum exists in a different judicial system and there is no mechanism by which the case may be transferred."  *Kelvion, Inc. v. PetroChina Can. Ltd.*, 918 F.3d 1088, 1091 (10th Cir. 2019).

The forum non conveniens analysis begins with two threshold questions:  (1) "whether there is an adequate alternative forum in which the defendant is amenable to process," and (2) "whether foreign law applies[.]"  *Gschwind*, 161 F.3d at 605.  "If the answer to either of these questions is no, the *forum non conveniens* doctrine is inapplicable."  *Id.* at 605–06.  But if "the answer to both questions is yes, the court goes on to weigh the private and public interests bearing on the *forum non conveniens* decision."  *Id.* at 606.

Usually, courts give substantial deference to a plaintiff's choice of forum.  *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947) ("[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."), *superseded in part by statute*, 28 U.S.C. § 1404(a), *as recognized in Am. Dredging Co.*, 510 U.S. 443.  But, when "the plaintiff is foreign, . . . this assumption is much less reasonable."  *Piper*, 454 U.S. at 256.  A "foreign plaintiff's choice deserves less deference."  *Id.*

**B.**     **Whether an Adequate Alternative Forum Exists Where Defendant is Amenable to Process**

The first threshold question asks whether an alternative forum for this lawsuit is both available and adequate.  Defendant "bears the burden of proving that an adequate alternative forum exists."  *Gschwind*, 161 F.3d at 606.

### 1.    Availability

Ordinarily, the availability requirement "will be satisfied when the defendant is 'amenable to process' in the other jurisdiction."  *Piper*, 454 U.S. at 254 n.22 (quoting *Gulf Oil*, 330 U.S. at 506–07).  When a defendant agrees "to be subject to suit" in the alternative forum, that "concession is generally enough to make the alternative forum available."  *Gschwind*, 161 F.3d at 606; *see also* 14D Richard D. Freer, *Federal Practice and Procedure* § 3828.3 (4th ed. 2022) ("Courts often allow a defendant to satisfy the availability requirement by stipulating that it will submit to personal jurisdiction in the alternative forum as a condition for the dismissal on forum non conveniens grounds.").

Here, defendant suggests Uruguay as an available, alternative forum.[5]  Doc. 14 at 10.  To address availability, defendant asserts that it is amenable to process in Uruguay because the Cereoil bankruptcy Trustee initiated both the Culpability and Claw-Back Actions against defendant in Uruguay.  And defendant also concedes it "would not contest personal jurisdiction in a regular Uruguayan civil court hearing [plaintiff's] claims."[6]  Doc. 24 at 16.  Uruguay thus

---

[5]     Plaintiff argues that defendant proposes a narrower version of an alternative forum, contending that defendant proposes "solely the Uruguayan bankruptcy litigation."  Doc. 21 at 18 (quotation cleaned up).  But the court doesn't read defendant's forum proposal so narrowly.  In defendant's Motion to Dismiss, defendant asserts that "Uruguay plainly qualifies as an adequate alternative forum" and explains that defendant and its subsidiaries "have already been subject to both the Culpability and Claw-Back Actions in Uruguay and are amenable to process there."  Doc. 14 at 10–11.  And defendant's Reply argues that both Uruguay's civil courts and its bankruptcy court offer an adequate alternative forum.  Doc. 24 at 15–16.  The court thus considers whether Uruguay—meaning both its civil and bankruptcy courts— provides an adequate alternative forum for these claims.

[6]     The court understands defendant's statements to mean that defendant agrees to submit to jurisdiction in Uruguay and, as explained below, expressly conditions its partial dismissal on the Uruguayan courts accepting this case.  If the Uruguayan courts refuse to hear the case for any reason, the

qualifies as an alternative forum. *See Gschwind*, 161 F.3d at 606–07 (concluding defendant's consent to suit in France, combined with district court's dismissal conditions, satisfied availability requirement); *see also Acosta v. JPMorgan Chase & Co.*, No. 05 Civ. 977(NRB), 2006 WL 229196, at *6 (S.D.N.Y. Jan. 30, 2006) (concluding defendant was amenable to process in Uruguay because defendants showed "they are already actively defending themselves in currently pending litigation in Uruguay"). Next, the court decides whether Uruguay qualifies as an adequate forum.

### 2.    Adequacy

"In rare circumstances, . . . where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative[.]" *Piper*, 454 U.S. at 254 n.22. An alternative forum is "'adequate' as long as the parties will not be deprived of all remedies or treated unfairly." *Alpine Atl. Asset Mgmt. AG v. Comstock*, 552 F. Supp. 2d 1268, 1277 (D. Kan. 2008) (collecting authorities). To qualify as an adequate, alternative forum, the "remedy provided by the alternate forum need not be the same as that provided by the American court." *Yavuz v. 61 MM, Ltd.*, 576 F.3d 1166, 1174 (10th Cir. 2009) (quotation cleaned up). And "the lack of a particular remedy or cause of action in the alternative . . . forum does not necessarily render that venue inadequate." *Id.* at 1176–77.

Plaintiff addresses the adequacy of the existing Uruguayan bankruptcy actions filed by the Cereoil bankruptcy Trustee—the Claw-Back Action and the Culpability Action—and argues

---

court, on motion, will reinstate the dismissed claim as part of this case because such a refusal would prove conclusively that Uruguay is not an available forum. *See Alpine Atl. Asset Mgmt. AG v. Comstock*, 552 F. Supp. 2d 1268, 1276 (D. Kan. 2008) (conditioning dismissal of case on forum non conveniens grounds and "out of an abundance of caution . . . on the condition that it will deem [defendant] to have consented to have this case reinstated in this court if the Swiss courts refuse jurisdiction"); *see also Gschwind*, 161 F.3d at 607 (affirming district court's conclusion about availability of foreign forum because district court conditioned forum non conveniens dismissal on defendants' consent to have action reinstated in District of Kansas if foreign court refused jurisdiction).

at great length that those actions cannot resolve its claims adequately.  More specifically, plaintiff contends that the Uruguayan bankruptcy case isn't an adequate alternative forum for four reasons:  (1) the bankruptcy will not determine the merits of plaintiff's tort claims; (2) the Uruguayan bankruptcy Trustee can't pursue any of plaintiff's individual claims against defendant; (3) plaintiff has no control over the claims brought in the bankruptcy proceeding; and (4) plaintiff has no independent right to recovery in the bankruptcy action.  Doc. 21 at 17–19; *see also* Doc. 21-1 at 2 (Brandes Decl. ¶¶ 7, 9–12).  But the adequacy analysis focuses on the "*remedy* provided by the alternate forum[.]" *Yavuz*, 576 F.3d at 1174 (emphasis added).  The court thus focuses its analysis on this issue:  whether the Uruguayan courts provide an adequate remedy.

The court doesn't read defendant's proposed alternative forum to suggest only the pending Uruguayan bankruptcy proceeding.  *See supra* n.5.  In other words, plaintiff could bring a civil action in Uruguay.  And indeed, plaintiff's Uruguayan counsel concedes as much in his Affidavit:  "Under Uruguayan law, an injured party may bring a separate lawsuit against a third party when a potential defendant is in bankruptcy."  Doc. 21-1 at 4 (Brandes Decl. ¶ 20).

Defendant also asserts that the existing bankruptcy proceeding is adequate because plaintiff "stands to gain up to the entire amount it is due from the Cereoil insolvency, including any outstanding balance on a loan, from [defendant] as a result of the Claw-Back and Culpability Actions."  Doc. 24 at 17 (emphasis omitted).  The Claw-Back Action "is a remedy aimed at returning property to the bankruptcy estate."  Doc. 14-4 at 6 (Ex. B-2 ¶ III.1.).  The Culpability Action alleges that defendant and its subsidiaries acted as de facto administrators of Cereoil and exercised de facto control over Cereoil's management.  Doc. 14-8 at 9 (Ex. B-6 ¶¶ III.8., III.10).  And the Culpability Action proposes that defendant and its subsidiaries "cover the entire equity

deficit of [Cereoil] to the benefit of creditors." *Id.* at 30 (Ex. B-6 ¶ VII.4.1.).  These arguments support defendant's contention that plaintiff might recover Cereoil's alleged deficit from defendant if the Trustee prevails in the Uruguayan bankruptcy proceeding.

Between the Uruguayan civil courts and the bankruptcy proceeding, defendant has established that plaintiff "will not be deprived of all remedies[.]"  *Alpine Atl.*, 552 F. Supp. 2d at 1277.  This case doesn't present the "rare circumstance[], . . . where the remedy offered by the other forum is clearly unsatisfactory[.]"  *Piper*, 454 U.S. at 254 n.22.  So, defendant has shouldered its burden to show that Uruguay provides an adequate and alternative forum for this action.  So, the answer to the first threshold question of the forum non conveniens analysis is yes, and the court thus turns to the second threshold question:  whether foreign law applies.  *Gschwind*, 161 F.3d at 605.

## C.      Foreign Law:  Does it Apply?

The second threshold question in the forum non conveniens analysis asks whether foreign law applies.  *Id.*  A federal district court sitting in diversity must apply the choice of law rules of the state where the court is located.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  The court thus applies Kansas choice of law principles to all seven of plaintiff's claims—*i.e.*, (1) breach of contract; (2) breach of covenant of good faith and fair dealing; (3) promissory estoppel; (4) unjust enrichment; (5) fraud; (6) negligent misrepresentation; and (7) fraud by concealment.  Doc. 2 at 13–22 (Compl. ¶¶ 71–117).  Below, the court organizes its choice of law analysis into three parts addressing:  the contract claims first and then turning to the unjust enrichment and tort claims.

### 1.      Contract Claims

Kansas choice of law rules divide contract claims into two categories.  They are:  (1) disputes that go "to the substance of the obligation[;]" and (2) questions that go "to the manner and method of performance . . . ."  *Moses v. Halstead*, 581 F.3d 1248, 1252 (10th Cir. 2009) (applying Kansas choice of law rules); *see also Cent. Power Sys. & Servs., Inc. v. Universal Underwriters Ins. Co.*, 319 P.3d 562, 566 (Kan. Ct. App. 2014) (same).  For the former—disputes about the substance of a contractual obligation—"the primary rule contained in Section 332" of the First Restatement applies.  581 F.3d at 1252 (citing Restatement (First) of Conflict of Laws § 332 (Am. L. Inst. 1934)).  This primary rule applies the lex loci contractus approach, *i.e.*, "the law of the state where the contract is made governs."  *Id.*  For the second category—questions going to the manner and method of performance—"the law of the place of performance applies."  *Id*. (citing Restatement (First) of Conflict of Laws § 358 (further citation omitted)).

As our Circuit has recognized, the Kansas cases "have struggled in determining whether questions raised in cases before [the Kansas courts] are governed by the law of the place of performance or the place where the contract was made."  *Moses*, 581 F.3d at 1252.  This struggle manifests a difficulty recognized by the Restatement itself.

> [T]here is no logical line which separates questions of the obligation of the contract, which is determined by the law of the place of contracting, from questions of performance, determined by the law of the place of performance.  There is, however, a practical line which is drawn in every case by the particular circumstances thereof.  When the application of the law of the place of contracting would extend to the determination of the minute details of the manner, method, time and sufficiency of performance so that it would be an unreasonable regulation of acts in the place of performance, the law of the place of contracting will cease to control and the law of the place of performance will be applied.  On the other hand, *when the application of the law of the place of performance would extend to a regulation of the substance of the obligation to which the parties purported to bind themselves so that*

> *it would unreasonably determine the effect of an agreement made in*
> *the place of contracting, the law of the place of performance will*
> *give way to the law of the place of contracting.*

Restatement (First) of Conflict of Laws § 358 cmt. b (1934) (emphasis added by the Circuit in *Moses*); *see also* Restatement (First) of Conflict of Laws § 332 cmt. c.

Here, all of plaintiff's contract claims belong in the second category because they allege that defendant failed to perform the Comfort Letter's obligations. *See, e.g.*, Doc. 2 at 14 (Compl. ¶ 75) (specifying defendant's performance failures under the Comfort Letter); *see also Moses*, 581 F.3d at 1253 ("In general, fulfillment of a contractual obligation goes to the manner and method of performance by the party charged with the obligation."). Nor is there much dispute about the substance of the Comfort Letter's obligations. So, the law of the place of performance applies to the contract claims asserted here.[7]

"'The place of performance is the state where, either by specific provision or by interpretation of the language of the promise, the promise is to be performed.'" *ARY Jewelers, LLC v. Krigel*, 85 P.3d 1151, 1162 (Kan. 2004) (quoting Restatement (First) of Conflict of Laws § 355 (Am. L. Inst. 1934)). Here, the Comfort Letter provides the relevant provisions that

---

[7]     This conclusion applies equally to plaintiff's promissory estoppel claim. "A promissory estoppel claim is a contract claim under Kansas law." *Mellon v. Cessna Aircraft Co.*, 7 F. Supp. 2d 1180, 1182 (D. Kan. 1998). Defendant argues that Uruguayan law applies to the promissory estoppel claim because the last act necessary for a promissory estoppel claim—reliance—occurred in Uruguay. Doc. 14 at 15–16. But the "last act necessary" test applies only to disputes about a contract's validity. *See Simms v. Metro. Life Ins. Co.*, 685 P.2d 321, 324 (Kan. Ct. App. 1984) (explaining that Kansas choice of law rules apply the *lex loci contractus* rule—where the contract was made—to disputes about contract construction); *see also Deere & Co. v. Loy*, 872 F. Supp. 867, 870 (D. Kan. 1994) ("In cases involving interpretation *of a* contract, Kansas courts apply the law of the place where the contract was made." (emphasis added) (citing *Simms*, 685 P.2d at 324)). *Mellon* suggests that the last act necessary test applies to promissory estoppel claims, but that case didn't consider the two distinct categories of contract claims used by Kansas's choice of law rules because it ultimately applied the District of Columbia's choice of law rules. 7 F. Supp. 2d at 1182. Here, plaintiff alleges that defendant made certain promises, plaintiff relied on those promises, and defendant failed to perform them. These allegations place this case's dispute squarely in the contract performance category, meaning that the law of the place of performance controls.

allegedly make "promises."  Doc. 2-1 at 2; *see also* Doc. 2 at 13–14 (Compl. ¶¶ 71–76 (alleging breach of contract, specifically relying on the Comfort Letter)).  The germane passages of the Comfort Letter provide:

> [Defendant] intends to maintain its present interest in [Cereoil][8] as well as its financial, operational and trade relationship with [it].
>
> [Defendant] confirms to [plaintiff] that it has been and currently is our time honoured and continuing policy to have our affiliates, partly or wholly owned, meet all of their financial and contractual obligations, as approved by such affiliates' boards of directors.  Nonetheless, by accepting this letter, you acknowledge that this letter is not a guarantee, but rather merely states our intention to monitor [Cereoil's] financial condition in a timely manner.
>
> [Defendant] appreciates this letter will be considered a further inducement towards [plaintiff] granting [the credit facility] to [Cereoil].

Doc. 2-1 at 2.  Defendant sent plaintiff the Comfort Letter from its Merriam, Kansas headquarters.  *Id.*

The parties closely dispute the place of the contract's performance.  Their dispute originates in their differing views about how best to characterize the performance of the Comfort Letter.  Defendant argues that the Comfort Letter fixes the place of performance in Uruguay because it obligated defendant to monitor Cereoil's financial position in Uruguay, maintain its relationship with Cereoil in Uruguay, and support Cereoil's payment to plaintiff in Uruguay. Doc. 14 at 15.  Plaintiff disagrees, arguing that the contract required defendant to act—monitor, maintain relationships, support payments, disclose information—from its Kansas headquarters. Doc. 21 at 21.

Both viewpoints make logical arguments.  Also, applying traditional choice of law principles to modern, globalized business transactions—ones that often play out through a

---

[8]      The Comfort Letter uses the term "Subsidiaries" to refer to both Cereoil and Nolston S.A.  For clarity, the court refers only to the lone relevant subsidiary—Cereoil.

computer network or a shared cloud—can make for an awkward fit.  But in the end, plaintiff has

the better of the argument.  Its arguments characterize the Comfort Letter in a way more faithful

to that agreement's literal terms.  The plain text of the Comfort Letter envisions defendant—

identified as the "Company" located at 9000 West 67th Street, Merriam, KS 66202—maintaining

its present interest in Cereoil, maintaining its present relationship with Cereoil, having Cereoil

meet its financial obligations, and monitoring Cereoil's financial condition.  Doc. 2-1 at 2.  It's a

fair point that the Comfort Letter envisions defendant aiming these actions at Cereoil in

Uruguay, but the actions themselves—*the performance*—originate in and emanate from

defendant's Kansas address.  The court thus concludes that Kansas is the place of performance, a

conclusion meaning that Kansas law applies to plaintiff's contract claims.

Since Kansas law applies, foreign law does not apply to plaintiff's contract claims.  The

court thus denies defendant's motion to dismiss plaintiff's contract claims based on forum non

conveniens.  *See Gschwind*, 161 F.3d at 605–06 (explaining that, if foreign law does not apply,

"the *forum non conveniens* doctrine is inapplicable").[9]

---

[9]      For a district court to dismiss a case based on forum non conveniens, Tenth Circuit precedent
requires the conclusion that foreign law applies to the case.  Defendant acknowledges that the Tenth
Circuit's foundational case on the matter, *Needham v. Phillips Petroleum Co. of Norway*, requires a
choice of law analysis—and this case concludes that if "American law is applicable to the case, the *forum
non conveniens* doctrine is inapplicable."  719 F.2d 1481, 1483 (10th Cir. 1983).

Defendant persists, arguing that the court should reconsider this precedent.  Defendant reasons
that Supreme Court precedent—namely *Piper* and *Gulf Oil*—doesn't require a choice of law analysis to
decide forum non conveniens issues.  Defendant tries to distinguish *Needham* because it involved a claim
under the Jones Act—a special maritime law—and Congress later removed the Jones Act's special venue
provision prohibiting forum non conveniens dismissal.  Doc. 14 at 14 n.11.  So, defendant argues, the
court should ignore the Tenth Circuit's precedent in *Needham* because, in light of the amendment to the
Jones Act, "there is no need to perform a choice of law analysis in connection with the *forum non
conveniens* test."  *Id.* (citing *Trotter v. 7R Holdings LLC*, 873 F.3d 435, 442 (3d Cir. 2017)).

But Congress amended the Jones Act in 2008.  *Trotter*, 873 F.3d at 441.  And in cases decided
since 2008, our Circuit has continued to require that foreign law apply to make a forum non conveniens
dismissal appropriate.  *See, e.g.*, *Archangel Diamond Corp. Liquidating Tr. v. Lukoil*, 812 F.3d 799, 804
(10th Cir. 2016) ("[T]he court must confirm that foreign law is applicable because forum non conveniens

### 2.    Unjust Enrichment Claim

Plaintiff also makes an unjust enrichment claim.  The parties assert that unjust enrichment

claims are governed by the state with the most significant relationship to the occurrence and the

parties.  Doc. 14 at 16; Doc. 21 at 21.  But the most significant relationship test relies on the

Restatement (Second) of Conflicts.  *See, e.g.*, *Delcavo v. Tour Res. Consultants, LLC*, No. 21-

2137-JWL, 2021 WL 4453572, at *2 (D. Kan. Sept. 29, 2021) (citing Restatement (Second) of

Conflicts § 221 (Am. L. Inst. 1971)).  Kansas courts follow the Restatement (First) of Conflicts,

*ARY Jewelers*, 85 P.3d at 1161, and the First Restatement provides that "[w]hen a person is

alleged to have been unjustly enriched, the law of the place of enrichment determines whether he

is under a duty to repay the amount by which he has been enriched."  Restatement (First) of

Conflict of Laws § 453 (Am. L. Inst. 1934).  Consistent with the First Restatement, the court

applies the law of the place of alleged enrichment.

Plaintiff alleges that it conferred a benefit on defendant when it restructured Cereoil's

debt.  Doc. 2 at 17 (Compl. ¶ 87).  Plaintiff also alleges defendant realized that benefit when it

diverted grain from the contract assigned to plaintiff to the grain sale agreement between Cereoil

and defendant.  *Id.* (Compl. ¶ 88).  So, in a procedural setting where the court must accept

plaintiff's factual allegations as true, the place of enrichment is defendant's location:  Kansas.[10]

Kansas law thus governs plaintiff's unjust enrichment claim.  In sum, foreign law does not apply

---

is improper if foreign law is not applicable and domestic law controls[.]" (quotation cleaned up)).  The
court is unpersuaded by defendant's argument and thus follows this binding Circuit precedent.

[10]    The court takes a narrow view of defendant's location because this view provides a more reliable,
predictable measure.  At this point, the court knows little about defendant's operations—*i.e.*, the court has
no idea where any soybeans were delivered or where defendant received its proceeds.  So, the court
necessarily relies on the principles that it always uses when it determines a corporation's residence.  They
place defendant at its principal place of business:  in Kansas.  And to be certain, defendant's motion
hasn't established that some other geography should govern.

to plaintiff's unjust enrichment claim, so the court denies defendant's motion to dismiss plaintiff's unjust enrichment claim based on forum non conveniens.  *See Gschwind*, 161 F.3d at 605–06 (explaining that, if foreign law does not apply, "the *forum non conveniens* doctrine is inapplicable").

### 3.     Tort Claims

Plaintiff also asserts three tort claims:  for fraud, negligent misrepresentation, and fraud by concealment.  Under Kansas choice of law principles, in tort cases "the law of the state where the tort occurred—*lex loci delicti*—should apply."  *Ling v. Jan's Liquors*, 703 P.2d 731, 735 (Kan. 1985).  Under "the doctrine of *lex loci delicti*, the situs of the injury determines the governing law."  *Id.*  Here, the alleged injury purportedly imposed by defendant's fraud, negligent misrepresentation, and fraud by concealment occurred in Uruguay.  That's where plaintiff—a Uruguayan bank—would have sustained a loss.  *See Hardesty, Puckett & Co. v. Empire Commc'ns, Inc.*, No. 89-4006-S, 1989 WL 106716 (D. Kan. Aug. 29, 1989) (determining that the situs of a corporation's economic injury was its principal place of business).  Uruguay law thus governs plaintiff's tort claims.

Foreign law thus applies to plaintiff's tort claims, and this conclusion satisfies the second threshold question of the forum non conveniens analysis.  The court continues the forum non conveniens analysis in part D, following below.

### D.     Private Interest Factors

If an adequate alternative forum exists where defendant is amenable to process and that forum's law applies, "the court goes on to weigh the private and public interest bearing on the *forum non conveniens* decision."  *Gschwind*, 161 F.3d at 606.  This analysis begins with the factors affecting the private interest.  These factors evaluate:

>  (1) the relative ease of access to sources of proof; (2) availability of compulsory
> process for compelling attendance of witnesses; (3) cost of obtaining attendance of
> willing non-party witnesses; (4) possibility of a view of the premises, if appropriate;
> and (5) all other practical problems that make trial of the case easy, expeditious and
> inexpensive.

*Id.* (citing *Gulf Oil*, 330 U.S. at 508).  Here, the court need not address the fourth factor because

this case doesn't involve "the premises[.]"  *Id.*  Separately, the court bears in mind that the forum

non conveniens doctrine gives deference to plaintiff's choice of forum.  But because plaintiff is a

foreign bank, the court gives less deference to its choice of this Kansas forum.

*First*, the court considers the relative ease of access to sources of proof.  The court does

not have many concerns about the ease of access to documents.  The parties are sophisticated,

and they regularly participate in international commerce during the digital age.  Indeed, the

current motion and its papers show that the parties can file documents that originated in Uruguay

with our court.  The problem is witnesses.  Many anticipated witnesses live in Uruguay.

Defendant asserts it has "at least 13 Uruguayan witnesses with critical information" and ten of

those witnesses aren't affiliated with plaintiff.  Doc. 24 at 23; *see also id.* at 23 n.40.

Comparatively, the parties have identified two potential witnesses with Kansas ties.  Doc. 21 at

23 n.5; Doc. 24 at 23.  So, the parties would have easier access to the Uruguayan witnesses if the

parties litigated the tort claims before a Uruguayan court.  Plaintiff argues that defendant has no

employees in Uruguay.  But defendant's employees aren't necessarily witnesses.  Instead, the

location of "anticipated witness[es]" provides more insight into the relative ease of access to

witnesses for trial.  *See Alpine Atl.*, 552 F. Supp. 2d at 1279–80 (finding that lack of anticipated

witnesses in Kansas favored dismissal).  Plaintiff mentions one potential witness located in

Ecuador, and two potential witnesses located in the Isle of Man.  Doc. 21 at 23.  Still, the number

of Uruguayan witnesses outweighs the number of witnesses located elsewhere. This first consideration favors dismissal.

*Second*, the court considers availability of compulsory process for compelling attendance of witnesses. Defendant expresses concerns that, if required to litigate the tort claims here in court, it may lack the ability to compel attendance of witnesses located in Uruguay. Uruguay is not a party to the Hague Convention on Service Abroad. Plaintiff responds to this concern with a declaration from plaintiff's Uruguayan counsel. This declaration explains that "Uruguay is a signatory to the Inter-American Convention on Letters Rogatory and Additional Protocol (IACAP), which would allow the parties to compel witnesses to appear for depositions in Uruguay, in case the formal requirements are met." Doc. 21-1 at 5 (Brandes Decl. ¶ 25). But the IACAP doesn't cure its concern, defendant argues, because the United States Department of State recently excluded "letters rogatory that have as their purpose the taking of evidence" from its IACAP obligations. Doc. 24 at 24 (citing No. 03-B, United States Permanent Mission to the Organization of American States, Department of State (Jan. 22, 2021), http://www.oas.org/en/sla/dil/docs/inter_american_treaties_central_authority_United_States_1-21-2021.pdf). Thus, on the current record, it appears that the court may not compel attendance of Uruguayan witnesses in Kansas. This second consideration represents a significant problem, so it weighs in favor of dismissing the tort claims, and significantly so.

*Third*, the court considers the cost of attendance for willing non-party witnesses. Simple math shows this factor also favors dismissal: more witnesses reside in Uruguay than the other countries combined. *See* Doc. 24 at 23 n.40. To be sure, no matter the forum, this case will involve significant litigation costs. "But, it would probably be less expensive, albeit perhaps

only slightly so, to secure the attendance of willing witnesses in [Uruguay] because more of them are located there." *Alpine Atl.*, 552 F. Supp. 2d at 1281.  This third factor also favors dismissal.

*Last*, the court considers "all other practical problems that make trial of the case easy, expeditious and inexpensive." *Gschwind*, 161 F.3d at 606 (citing *Gulf Oil*, 330 U.S. at 508). Plaintiff identifies just one practical problem.  Doc. 21 at 24.  A dismissal would require plaintiff to litigate its tort claims in Uruguay.  Even if plaintiff secures an award there, plaintiff contends it couldn't readily satisfy this judgment because defendant owns no assets in Uruguay.  *Id.*  But the "prevailing common law view is that judgments of foreign countries are entitled to recognition and enforcement largely to the same extent as sister-state judgments."  *Alpine Atl.*, 552 F. Supp. 2d at 1282 (citing Restatement of the Law (Third) of the Foreign Relations Law of the United States § 481 (Am. L. Inst. 1987)).  So, this practical problem doesn't concern the court.  Defendant likewise identifies one practical problem.  It argues that the language barrier presents practical problems because all communications between plaintiff and Cereoil used the Spanish language.  And, defendant contends, many of the pertinent documents are written in Spanish.  So, to present these communications in a Kansas courtroom would require significant translation work.  The court isn't persuaded by this argument either.  For one thing, this court and its bar routinely manage criminal trials involving substantial Spanish communications. Parties as sophisticated and resourceful as the two litigants here surely can manage the language barrier.  For another, if the court dismisses the tort claims in favor of a Uruguayan proceeding, the parties will have to translate communications from English to Spanish.  Nothing in the record permits the court to say the burden imposed by one model materially exceeds the other.  This fourth factor is neutral.

In sum, three of the four considerations favor dismissal. The fourth is neutral. And thus, on balance, the private interest factors of the tort claims favor dismissal under the forum non conveniens doctrine.

### E.    Public Interest Factor

The final step in the forum non conveniens analysis requires the court to weigh the public interest factor. This interest evaluates the following considerations:

> (1) administrative difficulties of courts with congested dockets which can be caused by cases not being filed at their place of origin; (2) the burden of jury duty on members of a community with no connection to the litigation; (3) the local interest in having localized controversies decided at home; and (4) the appropriateness of having diversity cases tried in a forum that is familiar with the governing law.

*Gschwind*, 161 F.3d at 606 (citing *Gulf Oil*, 330 U.S. at 508–09).

The parties don't address the first consideration—administrative difficulties of courts with congested dockets. So, the court doesn't consider that factor as part of its evaluation.

On the second consideration—"the burden of jury duty on members of a community with no connection to the litigation"—the parties disagree. Defendant contends that Kansas jurors have no connection to the litigation so they shouldn't have to bear the burden of resolving this complex case. Doc. 14 at 13 ("[T]his case concerns the insolvency of a Uruguayan exporting company and its effects on a Uruguayan bank."). Defendant also relies on the language barrier and its complicating effects. In contrast, plaintiff makes an appealing and simple argument: defendant chose to locate its corporate headquarters here, so Kansans have an innate and sufficient connection to the controversy.

Plaintiff has the better of this argument, but just barely. Defendant chose to establish its corporate headquarters here. And at least some of the relevant conduct transpired in Kansas. *See* Doc. 2 at 9 (Compl. ¶ 48). So, it rings a bit hollow for defendant to complain about the

26

convenience of a trial in Kansas.  But, other factors chip away at the value of these facts.  A full review of the Complaint's allegations reveals that more of the alleged events transpired in Uruguay.  The court concludes that this second consideration disfavors dismissal, but only by a narrow margin.

The third consideration—local interest in having localized controversies decided at home—also favors dismissal.  Defendant asserts that plaintiff felt the financial harm of its alleged torts in Uruguay.  Uruguayan courts have a stronger interest in holding defendant accountable.  Kansas, on the other hand, has less interest in deciding claims governed by Uruguayan law brought by a Uruguayan bank who allegedly sustained injury in Uruguay. *See id.* (concluding third public interest factor favored dismissal in favor of foreign forum where Kansans had "little if any interest in deciding claims under Swiss law brought by a Swiss corporation that was injured in Switzerland").

Last, the court considers "the appropriateness of having diversity cases tried in a forum that is familiar with the governing law." *Gschwind*, 161 F.3d at 606 (citing *Gulf Oil*, 330 U.S. at 508–09).  Uruguayan law applies to plaintiff's tort claims.  The court considers it far more appropriate to have plaintiff's tort claims tried in a Uruguayan forum, where the court is more familiar with Uruguayan law.  This fourth consideration favors dismissal and by a wide margin.

In sum, three of the governing considerations favor dismissal of the tort claims.  Just one weighs against dismissal, and only by a narrow margin.  The final consideration doesn't apply.  On balance, the public interest factor favors dismissal of the tort claims.

### F.     Summary

The court has concluded that—for some of plaintiff's claims—plaintiff's "chosen forum is inappropriate because of considerations affecting the court's own administrative and legal

problems[.]"  *Miller*, 510 U.S. at 447–48 (quotation cleaned up).  While plaintiff's chosen forum deserves deference, this deference is limited by the fact that plaintiff is foreign to the forum it chose.  In contrast, defendant has carried its burden to show that Uruguay provides an adequate, alternative forum.  Defendant also has shown that foreign law applies—but only to plaintiff's tort claims.  And the private/public interest factors favor dismissal.  Exercising its discretion under the forum non conveniens doctrine, the court dismisses plaintiff's tort claims without prejudice. The court conditions this dismissal on defendant readily submitting to jurisdiction in Uruguay— assuming plaintiff initiates a tort action there.  If defendant fails to do so, plaintiff may file a motion to amend to reassert those tort claims as part of this action.

The analysis of plaintiff's contract and unjust enrichment claims must continue, however, because foreign law does not apply to these claims.  These claims therefore fail the second threshold question of the forum non conveniens analysis.  *In re Orland Ltd.*, No. AP 20-04001-MJH, 2022 WL 885167, at *3 (B.A.P. 9th Cir. Mar. 25, 2022) (dismissing breach of contract claims under forum non conveniens but retaining alter ego claims because "*[f]orum non conveniens* is a flexible rather than an all-or-nothing doctrine" (citing *Piper*, 454 U.S. at 249–50)); *Scottish Air Int'l, Inc. v. British Caledonian Grp., PLC*, 81 F.3d 1224, 1234–35 (2d Cir. 1996) (dismissing some claims under forum non conveniens while retaining another claim and explaining that "[f]orum non conveniens is a doctrine that necessarily requires great flexibility" and "[d]epending upon the facts of the particular case, a district court may dismiss part of a lawsuit while deciding the merits of other issues").  So, while the court declines to dismiss plaintiff's contract and unjust enrichment claims under the forum non conveniens doctrine, it must move on to the next basis for dismissal asserted by defendant:  abstention.

IV.     *Colorado River* **Abstention and International Comity Abstention**

Defendant next involves two forms of abstention:  the *Colorado River* doctrine and international comity.  In a nutshell, defendant argues that the court should abstain from adjudicating this case because parallel litigation is proceeding in Uruguay.  The analysis begins with an overview of the two doctrines.

A.      **Legal Standard**

1.      *Colorado River*

The *Colorado River* doctrine applies "when one lawsuit suddenly becomes two, each proceeding along tracks that, although parallel, are far from identical."  *D.A. Osguthorpe Fam. P'ship v. ASC Utah, Inc.*, 705 F.3d 1223, 1233 (10th Cir. 2013).  The *Colorado River* doctrine is a form of abstention empowering district courts to "stay[ ] or dismiss[ ] a federal suit pending the resolution of a parallel state court proceeding."  *Id.* (quotation cleaned up).  But the "'doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it.'"  *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976) (quoting *Cnty. of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188–89 (1959)).  This doctrine's pathway is narrow because district courts bear a "virtually unflagging obligation . . . to exercise the jurisdiction given them."  *Id.* at 817.  "Abstention is not in order simply because a pending state-court proceeding involves the same subject matter."  *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013) (citation omitted).  "*Colorado River* concerns itself with efficiency and economy.  Its goal is to preserve judicial resources."  *D.A. Osguthorpe*, 705 F.3d at 1233 (quotation cleaned up).

Our Circuit has concluded that Supreme Court precedent adopts four factors to help courts determine when dismissal under this form of abstention is warranted: "(1) in an *in rem* action, whether the federal court was the first to assume jurisdiction over the property; (2) 'the inconvenience of the federal forum'; (3) 'the desirability of avoiding piecemeal litigation'; and (4) 'the order in which jurisdiction was obtained by the concurrent forums.'"   *Predator Int'l Inc. v. Gamo Outdoor USA, Inc.*, 793 F.3d 1177, 1189 (10th Cir. 2015) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 15 (1983)).  These four factors don't exclude all others.  In *Cone*, the Supreme Court "identified other factors that may be more applicable, 'such as the vexatious or reactive nature of either the federal or the state action; whether the federal law provides the rule of decision; and the adequacy of the state court action to protect the federal plaintiff's rights.'"  *Id.* at 1189–90 (quoting *Fox v. Maulding*, 16 F.3d 1079, 1082 (10th Cir. 1994) (citing *Cone*, 460 U.S. at 18 n.20, 23, 28) (quotation cleaned up)).  "No one factor is necessarily determinative[.]"  *Colo. River*, 424 U.S. at 818.  "Above all, the *Colorado River* factors must 'be applied in a pragmatic, flexible manner with a view to the realities of the case at hand.'"  *D.A. Osguthorpe*, 705 F.3d at 1235–36 (quoting *Cone*, 460 U.S. at 21).  Plaintiff correctly argues that our Circuit never has applied the *Colorado River* doctrine to the procedural setting presented here, *i.e.*, based on proceedings in a foreign forum.

## 2.      International Comity

Separate from *Colorado River* abstention, defendant also invokes "principles of international comity" and argues that these principles also favor abstention.  The Supreme Court has described international comity abstention as "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or other persons who

30

are under the protection of its laws." *Hilton v. Guyot*, 159 U.S. 113, 164 (1895); *see also JP Morgan Chase Bank v. Altos Hornos de Mex.*, 412 F.3d 418, 423–24 (2d Cir. 2005) (reviewing the origins of international comity).  Defendant here invokes "adjudicatory comity"—"a discretionary act of deference by a national court to decline to exercise jurisdiction in a case properly adjudicated in a foreign state[.]" *In re Maxwell Commc'n Corp.*, 93 F.3d 1036, 1047 (2d Cir. 1996); *see also Cooper v. Tokyo Elec. Power Co.*, 860 F.3d 1193, 1205 (9th Cir. 2017) ("There are two kinds of international comity:  prescriptive comity (addressing the extraterritorial reach of federal statutes) and adjudicative comity (a discretionary act of deference by a national court to decline to exercise jurisdiction in a case properly adjudicated in a foreign state)." (quotation cleaned up)).

The Supreme Court and the Tenth Circuit have not provided guidance for the precise issue presented here, *i.e.*, when a district court should stay or dismiss an action in deference to parallel proceedings in a foreign forum.  Without explicit guidance from the Supreme Court, federal courts have developed three different approaches to foreign parallel proceedings.[11]

*First*, some Circuits apply *Colorado River*'s analysis of parallel state proceedings to parallel foreign proceedings.  *Answers in Genesis of Ky., Inc. v. Creation Ministries Int'l, Ltd.*, 556 F.3d 459, 467–69 (6th Cir. 2009); *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225,

---

[11]    Scholars divide the "international comity" caselaw differently and label their subdivisions in various ways.  *See, e.g.*, N. Jansen Calamita, *Rethinking Comity:  Towards a Coherent Treatment of International Parallel Proceedings*, 27 U. Pa. J. Int'l Econ. L. 601, 613–14 (2006) (dividing federal court approaches into three categories:  (1) the "Abstentionists," relying on *Colorado River*; (2) the "*Landites*," referring to *Landis v. North American Co.*, 299 U.S. 248 (1936); and (3) the "Internationalists," relying on the Eleventh Circuit's concept of "international abstention"); Maggie Gardner, *Deferring to Foreign Courts*, 169 U. Pa. L. Rev. 2291, 2331–33 (2021) (dividing the federal court approaches into three categories:  (1) applying *Colorado River* to transnational cases; (2) the Southern District of New York's approach; and (3) the "international comity abstention" framework used by the Eleventh and Second Circuits).  The court defines its own three categories for a purely pragmatic reason:  to explain where defendant's arguments in this case best fit.

232–33 (4th Cir. 2000); *Neuchatel Swiss Gen. Ins. Co. v. Lufthansa Airlines*, 925 F.2d 1193,

1194–95 (9th Cir. 1991); *Ingersoll Milling Mach. Co. v. Granger*, 833 F.2d 680, 684–86 (7th

Cir. 1987).

*Second*, the Eleventh Circuit has developed its own test—an international comity analysis

based on *Colorado River*.  *See Turner Ent. Co. v. Degeto Film GmbH*, 25 F.3d 1512, 1518 (11th

Cir. 1994).  The Eleventh Circuit has "identified three factors for determining whether abstention

is appropriate:  (1) international comity; (2) fairness to litigants; and (3) efficient use of scarce

judicial resources."  *Belize Telecom, Ltd. v. Gov't of Belize*, 528 F.3d 1298, 1305 (11th Cir.

2008) (citing *Turner*, 25 F.3d at 1518).

*Third*, the Second Circuit, drawing in large measure on cases decided by the Southern

District of New York and the same district's bankruptcy courts, created what it has called

"international comity abstention."  *Royal & Sun All. Ins. Co. of Can. v. Century Int'l Arms, Inc.*,

466 F.3d 88, 92 (2d Cir. 2006).  The Second Circuit's test adopts the Eleventh Circuit's guiding

principles of international comity:  "proper respect for litigation in and the courts of a sovereign

nation, fairness to litigants, and judicial efficiency." *Id.* at 94 (citing *Turner*, 25 F.3d at 1518).

The Second Circuit uses *Colorado River*-like factors to account for differences between state

forums and forums in other countries.  *See, e.g.*, *Evergreen Marine Corp. v. Welgrow Int'l Inc.*,

954 F. Supp. 101, 104 n.1 (S.D.N.Y. 1997) ("While *Colorado River* and its progeny may be

instructive in the present context, the considerations involved in deferring to state court

proceedings are different from those involved in deferring to foreign proceedings, where

concerns of international comity arise and issues of federalism and federal supremacy are not in

play.").  The relevant factors for this approach to international abstention include:

> the similarity of the parties, the similarity of the issues, the order in which the
> actions were filed, the adequacy of the alternate forum, the potential prejudice to

either party, the convenience of the parties, the connection between the litigation
and the United States, and the connection between the litigation and the foreign
jurisdiction.

*Royal & Sun*, 466 F.3d at 94 (citing *Finova Cap. Corp. v. Ryan Helicopters U.S.A., Inc.*, 180

F.3d 896, 898–99 (7th Cir. 1999) (citing *Colo. River*, 424 U.S. at 818)).

Defendant's motion invokes the Second Circuit's approach to international comity, citing

*Royal & Sun* often.  *See, e.g.*, Doc. 14 at 18, 27.  Other district courts—including a district court

in our Circuit—have used this approach.  *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v.*

*Kozeny*, 115 F. Supp. 2d 1243, 1247 (D. Colo. 2000); *see also Goldhammer v. Dunkin' Donuts,*

*Inc.*, 59 F. Supp. 2d 248, 252–53 (D. Mass. 1999); *Abdullah Sayid Rajab Al-Rifai & Sons W.L.L.*

*v. McDonnell Douglas Foreign Sales Corp.*, 988 F. Supp. 1285, 1289 (E.D. Mo. 1997).  Here,

defendant specifically cites the approach used by the District of Colorado in its *Kozeny* decision.

But *Royal & Sun* and other cases decided by the Southern District of New York add an

additional wrinkle to the foreign parallel proceedings analysis:  consideration of foreign

bankruptcy proceedings.  The Second Circuit "repeatedly [has] held that U.S. courts should

ordinarily decline to adjudicate creditor claims that are the subject of a foreign bankruptcy

proceeding." *JP Morgan Chase*, 412 F.3d at 424.  In contrast, the *Colorado River* doctrine starts

in a much different place:  it emphasizes district courts' "virtually unflagging obligation . . . to

exercise the jurisdiction given them." *Colo. River*, 424 U.S. at 817.  To put it another way, the

Second Circuit has developed an exception to the exception.  District courts should abstain only

in extraordinary circumstances, unless the parallel litigation is a foreign bankruptcy proceeding.

*See Royal & Sun*, 466 F.3d at 92–93 ("We have recognized one discrete category of foreign

litigation that generally requires the dismissal of parallel district court actions—foreign

bankruptcy proceedings.").  The Second Circuit embraced this principle because a "foreign

nation's interest in the equitable and orderly distribution of a debtor's property is an interest deserving of particular respect and deference, and accordingly" the Second Circuit has "followed the general practice of American courts and regularly deferred to such actions."  *Id.* at 93 (quotation cleaned up).

With this background, the court now turns to the specific arguments defendant makes here.  Defendant argues that the court should dismiss or stay this action under *Colorado River* abstention.  But defendant's argument is a meld because it does not ask the court simply to apply the *Colorado River* factors to the foreign proceedings (the first approach discussed above). Instead, defendant's papers fold in the Second Circuit's approach to international comity, one that applies *Colorado River*-like factors but adapts them to *foreign* parallel litigation and guided by the principles identified by the Eleventh Circuit.  *See* Doc. 14 at 18 (first citing *Kozeny*, 115 F. Supp. 2d at 1247; then citing *Royal & Sun*, 466 F.3d at 94).  So, the court views defendant's abstention argument predominantly as an international comity argument—not a *Colorado River* argument.[12]

Separately, defendant makes an "international comity" abstention argument.  *Id.* at 26– 29.  This argument, in reality, is based on the foreign bankruptcy exception from the Second Circuit and Southern District of New York cases.  Indeed, those are the cases that defendant cites most heavily.  *See, e.g.*, Doc. 14 at 27–28.  And based on those authorities, defendant argues that this lawsuit represents "precisely the sort of creditor end-run around a foreign bankruptcy

---

[12]     Plaintiff correctly argues that the Tenth Circuit never has applied *Colorado River* abstention based on foreign parallel proceedings.  *See* Doc. 21 at 26–27.  Then, expanding this accurate premise, plaintiff contends that the Circuit implicitly has limited *Colorado River* abstention to parallel *state* proceedings.  This argument isn't persuasive.  To the contrary, the court predicts that our Circuit, if faced with the question presented here, would supplement its *Colorado River* analysis with appropriate factors for abstention based on parallel *international* proceedings.  In short, the court predicts our Circuit would follow the Second Circuit's approach in its international comity cases.

proceeding that warrants abstention[.]" *Id.* at 28.  So, defendant evokes the "exception to the exception" form of comity discussed above.

The court predicts that our Circuit, if faced with the issue of a parallel foreign bankruptcy proceeding, would adopt the Second Circuit's approach.  The Second Circuit and the Southern District of New York frequently encounter cases involving parallel foreign bankruptcy cases and thus they have developed a robust framework for considering abstention issues based on that kind of parallel proceeding.  And the court agrees with the Second Circuit (and its constituent courts) that international parallel proceedings involve different concerns than the issues of federalism addressed in *Colorado River*.

In sum, defendant argues for abstention based on two forms of international comity.  In part B, below, the court first decides whether this case falls within this foreign bankruptcy exception of the international comity doctrine.  Concluding that it doesn't, Part C, following, takes up defendant's *Colorado River* arguments.

### B.    Whether this Action is Parallel to a Foreign Bankruptcy Proceeding

To determine whether this case falls within the foreign bankruptcy exception, the court must determine whether this action constitutes "the sort of end-run around a parallel bankruptcy proceeding of which [the Second Circuit has] repeatedly disapproved." *JP Morgan Chase*, 412 F.3d at 427.  Defendant contends that it does, arguing that the "Claw-Back and Culpability Actions are plainly foreign bankruptcy proceedings" that "seek to recover assets from [defendant] in order to satisfy obligations to creditors of Cereoil."  Doc. 14 at 28.

Plaintiff disagrees.  It argues that this action is entirely separate from Cereoil's bankruptcy proceeding.  Plaintiff's Uruguayan counsel explains that "Uruguayan law . . . prohibits bringing a claim against or promoting a claim against the bankrupt debtor in a

judicial or arbitration proceeding[.]" Doc. 21-1 at 4 (Brandes Dec. ¶ 19). This Uruguayan

mechanism is analogous to the stay imposed by American bankruptcy filings. *See, e.g.*, 11

U.S.C. § 362(a)(1) (imposing an automatic stay when debtor files bankruptcy petition and

preventing "the commencement or continuation . . . of a judicial, administrative, or other action

or proceeding against the debtor . . . or to recover a claim against the debtor that arose before the

commencement of the case"). So, Uruguayan law prohibits plaintiff from bringing a claim

against Cereoil, the debtor in Uruguay's bankruptcy case. But the stay from the Uruguayan

bankruptcy court "does not extend to claims against solvent third parties" like defendant here.

Doc. 21-1 at 4 (Brandes Decl. ¶ 19).

Plaintiff's counsel explains that under "Uruguayan law, an injured party may bring a

separate lawsuit against a third party when a potential defendant is in bankruptcy." *Id.* (Brandes

Decl. ¶ 20). Indeed, defendant "Seaboard is not the bankrupt debtor[,]" so Uruguayan law does

not even "authorize a stay of [plaintiff's] claims against" defendant. *Id.* (Brandes Decl. ¶ 21).

Plaintiff's counsel also explains that the Uruguayan "bankruptcy judge [in Cereoil's bankruptcy

proceeding] has not issued a safeguard plan that would prohibit [plaintiff] from bringing

individual claims against [defendant], nor has [defendant] asked for such an order in the

bankruptcy proceeding." *Id.* (Brandes Decl. ¶ 22).

Plaintiff also has provided a declaration from the Trustee in Cereoil's Uruguayan

bankruptcy. *See* Doc. 21-2. The Trustee's declaration confirms that plaintiff's "separate

claims . . . against [defendant] in the United States do not interfere with the bankruptcy

proceeding, as Uruguayan law permits such third-party actions." *Id.* at 2 (Ferreira Decl. ¶ 10).

The Trustee assures that any "amounts collected by [plaintiff] by virtue of individual claims filed

by [plaintiff] against [defendant] in Case No. 2:21-cv-02435-DDC-TJJ in the United States

District Court for the District of Kansas, will be deducted from the amounts that [plaintiff] is owed in Cereoil's bankruptcy proceeding." *Id.* (Ferreira Decl. ¶ 11).

In short, plaintiff's right—this action doesn't amount to an end-run around Cereoil's bankruptcy proceeding in Uruguay. This case just isn't like the cases defendant relies on, cases where the foreign and domestic proceedings were so closely intertwined that the domestic proceeding—if allowed to proceed—would interfere with the foreign one. *Cf. Moyal v. Münsterland Gruppe GmbH & Co. KG*, 539 F. Supp. 3d 305, 307, 309–10 (S.D.N.Y. 2021) (dismissing case based on comity principles where plaintiff sued defendant for breach in 2019, then, in 2021, defendant filed for bankruptcy in Germany and bankruptcy proceeding automatically stayed all previously filed actions against defendant); *Oui Fin. LLC v. Dellar*, No. 12 Civ. 7744(RA), 2013 WL 5568732, at *11 (S.D.N.Y. Oct. 9, 2013) (dismissing, on comity grounds, creditor's action against guarantor of bankrupt company's debt where bankruptcy proceeding was underway in France and guarantor's "obligations [were] clearly closely intertwined" with bankrupt's obligations, so "[p]ermitting Plaintiff to obtain a judgment against [guarantor] in [the New York court] would very likely interfere with implementation of [the French bankruptcy court's] recently-adopted safeguard plan").

Defendant also cites cases where the property at issue in the domestic dispute is directly tied to the foreign bankruptcy proceeding because a creditor in the bankruptcy case has staked a claim to the debtor's property, but the bankrupt debtor claims that the property belongs to the debtor's bankruptcy estate. *Cf. JP Morgan Chase*, 412 F.3d at 419–20, 426–27 (affirming dismissal of creditor action "on grounds of international comity" and deferring to foreign bankruptcy proceeding in property dispute between bank and bankrupt debtor over ownership of collecting account that debtor claimed as part of its estate in foreign bankruptcy); *Victrix S.S. Co.*

*v. Salen Dry Cargo A.B.*, 825 F.2d 709, 711 (2d Cir. 1987) (affirming trial court's dismissal of plaintiff's in personam admiralty action that sought to attach bankrupt Swedish company's New York account in deference to defendant's Swedish bankruptcy proceeding). Again, this case doesn't resemble these cases.

Because this action is not parallel to a foreign bankruptcy proceeding, the court now turns to the other international comity framework—defendant's *Colorado River* argument.

### C.   Whether the Court Should Decline to Exercise Jurisdiction Under "International Comity"

Next, defendant relies on international comity abstention. Earlier in this Order, the court summarized the three approaches taken by various Circuits to this doctrine. *See supra* § IV.A.2. But the parties' papers here use a different approach. They instead organize their comity arguments around the six-factor test used by another district court in our Circuit—the District of Colorado in the *Kozeny* case, 115 F. Supp. 2d at 1247. *See* Doc. 14 at 18; Doc. 21 at 27–31. Because our Circuit hasn't adopted any one of these three approaches used in the other Circuits, the court adopts the parties' convention and applies the approach applied in *Kozeny*.

The court's analysis uses the same six factors applied by the parties. The court believes that these six factors capture the essence of the various tests used by other Circuits. Also, these factors comport with the Supreme Court's recognition that courts need flexibility to apply abstention doctrine appropriately. *See Cone*, 460 U.S. at 16 (16 ("[T]he decision whether to dismiss a federal action because of parallel state-court litigation does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction. The weight to be given to any one factor may vary greatly from case to case, depending on the particular setting of the case."). The six factors applied in *Kozeny* are:

1) similarity of parties and issues involved in the foreign litigation; 2) the promotion of judicial efficiency; 3) adequacy of relief available in the alternative forum; 4) issues of fairness to and convenience of the parties, counsel, and witnesses; 5) the possibility of prejudice to any of the parties; and 6) the temporal sequence of the filing of the actions.

115 F. Supp. 2d at 1247.

### 1.    Similarity of Parties and Issues

First:  the parties.  "For two actions to be considered parallel, the parties in the actions need not be the same, but they must be substantially the same, litigating substantially the same issues in both actions."  *Royal & Sun*, 466 F.3d at 94.  Here, the Claw-Back Action and the Culpability Action in Uruguay involve—among many others—the Cereoil bankruptcy Trustee and defendant.  Defendant argues that the bankruptcy Trustee acts on behalf of creditors, but the bankruptcy Trustee does not *represent* creditors such as plaintiff.  Doc. 21-1 at 2 (Brandes Decl. ¶ 9); Doc. 21-2 at 2 (Ferreira Decl. ¶ 8).  And plaintiff's Uruguayan counsel explains that "in certain circumstances," the Trustee "acts *against* creditors."  Doc. 21-1 at 2 (Brandes Decl. ¶ 9) (emphasis added).  *Kozeny* held that the parties in that case were the same because one defendant exercised *control* over shell corporation defendants, though the shell corporations were not parties in the foreign proceedings.  115 F. Supp. 2d at 1247.  In contrast, here, plaintiff has no control over the Trustee or his actions.  Doc. 21-1 at 2 (Brandes Decl. ¶ 10).  The court concludes that the parties in the Uruguayan actions are not "substantially the same" as the parties here.  *Royal & Sun*, 466 F.3d at 94.  This conclusion weighs against dismissing or staying this action under the international comity doctrine.

Second:  the issues.  Plaintiff argues that no participant in the Uruguayan bankruptcy actions—(the Claw-Back Action and the Culpability Action)—asserts the contract claims asserted by plaintiff here.  Doc. 21 at 27.  Defendant responds that the actions "are factually,

legally, and functionally similar." Doc. 24 at 26.  Both the Uruguayan bankruptcy actions and

plaintiff's Complaint here allege that defendant controlled Cereoil.  And both the Uruguayan

bankruptcy actions and plaintiff's Complaint allege that the June and July 2016 contracts

between defendant and Cereoil unjustly enriched defendant.  Defendant also asserts that its

defenses in this action will parallel its defenses in the Uruguay action.

 The court finds a res judicata analysis particularly helpful here.  If the Uruguayan actions

would have a preclusive effect on this action, that certainly would favor dismissal or stay.

*Herbstein v. Bruetman*, 743 F. Supp. 184, 188 (S.D.N.Y. 1990) ("[C]omity requires that the

parties and issues in both litigations are the same or sufficiently similar, such that the doctrine of

*res judicata* can be asserted."); *see also In re Nat'l Bank of Anguilla (Priv. Banking Tr.) Ltd.*,

580 B.R. 64, 98–100 (Bankr. S.D.N.Y 2018) (staying bankruptcy action in favor of foreign

bankruptcy proceeding where "resolution of the Anguilla Litigation will prove highly instructive,

if not completely dispositive, on the ultimate resolution of these Adversary Proceedings"); *Ole*

*Media Mgmt., L.P. v. EMI April Music, Inc.*, No. 12 Civ. 7249(PAE), 2013 WL 2531277, at *4

(S.D.N.Y. June 10, 2013) (finding substantial similarity between cases because determination in

foreign lawsuit would "have significant bearing, and *res judicata* effect, on the dispute . . . at

issue here").  Res judicata requires four elements:

> (1) the prior suit must have ended with a judgment on the merits; (2) the parties
> must be identical or in privity; (3) the suit must be based on the same cause of
> action; and (4) the plaintiff must have had a full and fair opportunity to litigate the
> claim in the prior suit.

*Nwosun v. Gen. Mills Rests., Inc.*, 124 F.3d 1255, 1257 (10th Cir. 1997).  Like the abstention

doctrines discussed above, res judicata "is intended to relieve parties of burdensome multiple

lawsuits, prevent inconsistent decisions, and encourage reliance on adjudication."  *Hoxworth v.*

*Blinder*, 74 F.3d 205, 208 (10th Cir. 1996).

Here, the parties are not identical or in privity with the parties in the Uruguayan actions. The Trustee may pursue claims on behalf of creditors, but the Trustee is not automatically in privity with the creditors. *Cf. Hoxworth*, 74 F.3d at 208 (concluding privity did not extend from trustee to judgment creditors because their interests diverged). Nor is this suit based on the same cause of action as the Uruguayan bankruptcy actions. Defendant concedes that no one in the Uruguayan bankruptcy actions asserts plaintiff's contract claims based on the Comfort Letter. Doc. 14 at 21 n.32. The outcomes of the Claw-Back Action and Culpability Action will not have a preclusive effect here. The court thus concludes that the two actions in Uruguay are not substantially similar to this case.

Nonetheless, defendant argues that the actions, though not identical, seek the same thing: to hold defendant accountable for its alleged role in Cereoil's bankruptcy. Defendant argues that the two actions arise from "the same core allegations[.]" Doc. 24 at 27. So, defendant contends, plaintiff's claims represent a "mere subset of the broader set of allegations and claims brought by the Trustee for the benefit of all creditors[.]" *Id.* The court isn't persuaded by this argument.

The Uruguayan bankruptcy Trustee explains that the "*separate* claims of [plaintiff] against [defendant] in the United States do not interfere with the bankruptcy proceedings, as Uruguayan law permits such third-party actions." Doc. 21-2 at 2 (Ferreira Decl. ¶ 10) (emphasis added). Indeed, Uruguayan law permits "an injured party [to] bring a separate lawsuit against a third party when a potential defendant is in bankruptcy." Doc. 21-1 at 4 (Brandes Decl. ¶ 20). None of this is to say the actions don't overlap. They do. But the Uruguayan bankruptcy actions do not involve the Comfort Letter. The court thus concludes that the parties to the two separate proceedings are not "litigating substantially the same issues in both actions." *Royal & Sun*, 466

F.3d at 94.  This factor thus weighs against a dismissal or a stay under the international comity doctrine.

### 2.      Promotion of Judicial Efficiency

Defendant argues that dismissal or stay will promote judicial efficiency because litigating the case in Kansas will prove inefficient.  Defendant argues that proceeding with this lawsuit in Kansas will force the parties "to make duplicative arguments and offers of proof in two different jurisdictions with two different sets of attorneys using two different languages."  Doc. 14 at 21.  Plaintiff sees things differently.  It argues that allowing this lawsuit to proceed would promote judicial efficiency because, when the "Uruguayan proceeding concludes, [plaintiff's] individual claims against [defendant] will not be resolved," and "no efficiencies would be gained by a stay."  Doc. 21 at 29–30.

In the court's view, no location will provide a perfectly efficient place to litigate this action.  Whether litigated here or in the Uruguayan proceeding, the parties will have to bring in witnesses from another country.  Both forums would face a potential language problem.  And both forums might have to apply the law of another country.  In its forum non conveniens analysis, the court concluded that Uruguay offered a more convenient place to adjudicate plaintiff's tort claims.  But it is not necessarily a more convenient place for plaintiff's contract claims, especially because Kansas law governs those claims.  These are the vagaries of international business transactions between sophisticated market participants.  This factor neither favors not disfavors abstention.  Too much is unknown currently to produce a satisfactory conclusion about it.

### 3.      Adequacy of Relief Available in Other Forum

For this factor, the court borrows the concept of "adequacy" from the forum non conveniens doctrine.  And, as above, the court concludes that the Uruguayan forum offers an adequate remedy.  *See* § III.B.2.  This factor thus favors abstention.

### 4.   Issues of Fairness to and Convenience of the Parties, Counsel, and Witnesses

The fourth factor in the "international comity abstention" analysis evaluates the fairness and convenience of the parties, counsel, and witnesses.  Defendant maintains its principal place of business here in Kansas.  Plaintiff argues (and defendant does not dispute) that all of defendant's employees have left Uruguay.  Thus, it is not unfair to require defendant to litigate this dispute in its home state, Kansas.  *See Kozeny*, 115 F. Supp. 2d at 1248 (concluding "it [was] not unfair to require [defendant] to litigate [the] dispute in" London because defendant "reside[d] in London for two months each year").  Also, dismissing this litigation would prove unfair to plaintiff.  The controlling law allows plaintiff to bring an action like the one asserted here.  Plaintiff exercised its right and chose to bring its action here.  So, issues of fairness weigh against abstention.

The court recognizes that litigating this case in Kansas could prove inconvenient.  Defendant argues, with some justification, that it "would have limited access, if any, to non-party witnesses in Uruguay who do not consent to appear."  Doc. 14 at 23.  Defendant also argues that most witnesses are in Uruguay and specifically identifies the Uruguayan witnesses it would seek to call.  Doc. 24 at 23 n.40.  Defendant expresses concerns about its access to these witnesses because Uruguay is not a party to the Hague Convention on Service Abroad.  And, as already discussed, plaintiff's Uruguayan counsel explains that "Uruguay is a signatory to the [IACAP], which would allow the parties to compel witnesses to appear for depositions in Uruguay, in case the formal requirements are met."  Doc. 21-1 at 5 (Brandes Decl. ¶ 25).  But defendant notes that

the IACAP does not cure this issue because the United States Department of State recently excluded from its IACAP obligations "letters rogatory that have as their purpose the taking of evidence".  Doc. 24 at 24 (citing No. 03-B, United States Permanent Mission to the Organization of American States, Department of State (Jan. 22, 2021), http://www.oas.org/en/sla/dil/docs/inter_american_treaties_central_authority_United_States_1-21-2021.pdf ).

On balance, the court finds that the convenience of the parties, counsel, and witnesses favor abstention.  But more fundamental issues of fairness do not favor abstention.  The court thus concludes that this factor, overall, does not materially influence the abstention analysis.

### 5.     Possibility of Prejudice to Any Party

Defendant argues that permitting this action to proceed presents a real possibility of prejudice because of the costs of "defending duplicative legal proceedings concerning the same allegations, the same witnesses, and overlapping parties on two continents, using two sets of outside counsel and proceeding in two different languages[.]"  Doc. 14 at 24.  As already explained, the court does not view this case's claims as substantially similar to the issues in the Uruguayan bankruptcy actions:  the parties are not the same and the claims are not the same.  The court also doubts that litigation on two continents and in two languages is an unbearable burden for defendant.  Defendant is a sophisticated, international corporation who has established the wherewithal to engage in international business.  Indeed, this case's allegations prove its reach and grasp.

Defendant also argues that it "is faced with a very real threat of duplicative liabilities."  Doc. 24 at 29.  But plaintiff provided a declaration from the Uruguayan bankruptcy Trustee explaining that any "amounts collected by [plaintiff] by virtue of the individual claims filed by

[plaintiff] against [defendant] in Case No. 2:21-cv-02435-DDC-TJJ in the United States District Court for the District of Kansas, will be deducted from the amounts that [plaintiff] is owed in Cereoil's bankruptcy proceeding." Doc. 21-1 at 2 (Ferreira Decl. ¶ 11). Defendant doesn't controvert this point. This resolves any concerns about double recovery.

The court concludes that this fifth factor weighs against abstention.

### 6. Temporal Sequence of Filing

Cereoil filed for bankruptcy in September 2016. Doc. 2 at 11–12 (Compl. ¶ 62). The Uruguayan bankruptcy Trustee filed the Claw-Back Action in March 2018, Doc. 14-4 at 2 (Ex. B-2) and the Culpability Action in April 2018, Doc. 14-8 at 2 (Ex. B-6). Plaintiff filed this lawsuit on September 30, 2021. *See generally* Doc. 2. At first glance, this sequence might seem to favor abstention. But Cereoil declared bankruptcy before its obligations to plaintiff came due. And, in 2019, defendant agreed to toll the statute of limitations for plaintiff's claims. *Id.* at 13 (Compl. ¶¶ 69–70). So, the timing of the two actions does not fully inform the abstention analysis meaningfully.

The court concludes that the temporal sequence of the actions' filings favors abstention, but only slightly.

### 7. Summary

Factor one and factor five weigh against abstention. Factor two and factor four are neutral. Factor three favors abstention. And factor six favors abstention, but just slightly. Added together it's a wash.

"The task of a district court evaluating a request for dismissal based on a parallel foreign proceeding is not to articulate a justification *for* the exercise of jurisdiction, but rather to determine whether exceptional circumstances exist that justify the surrender of that jurisdiction."

*Royal & Sun*, 466 F.3d at 93 (first citing *Cone*, 460 U.S. at 25–26; then citing *Colo. River*, 424

U.S. at 813).  Given the close balance of the factors here, the court cannot find that exceptional

circumstances exist.  *Kozeny*'s factors do not yield a result sufficient to "negate the district

courts' 'virtually unflagging obligation . . . to exercise the jurisdiction given them.'"  *Id.* at 92

(quoting *Colo. River*, 424 U.S. at 817).  The court thus denies defendant's motion to dismiss

based on international comity.  This conclusion means the court must consider and decide

defendant's other argument for dismissal:  Fed. R. Civ. P. 12(b)(7).

## V.     Rule 12(b)(7):  Failure to Join a Party Under Rule 19

Asserting that this action cannot proceed without Cereoil's Uruguayan bankruptcy

Trustee, defendant moves to dismiss the case under Fed. R. Civ. P. 12(b)(7) for "failure to join a

party under Rule 19."  The court's analysis of this aspect of defendant's motion begins with the

governing legal standard.

### A.     Legal Standard

Fed. R. Civ. P. 12(b)(7) permits a district court to dismiss a case if plaintiff has failed to

join a necessary and indispensable party, as Fed. R. Civ. P. 19 requires.  As the proponent of a

Rule 12(b)(7) motion, defendant bears "the burden of producing evidence showing the nature of

the interest possessed by an absent party and that the protection of that interest will be impaired

by the absence." *Citizen Band Potawatomi Indian Tribe of Okla. v. Collier*, 17 F.3d 1292, 1293

(10th Cir. 1994).  Defendant can meet this burden with "'affidavits of persons having knowledge

of these interests as well as other relevant extra-pleading evidence.'"  *Id*. (quoting *Martin v. Loc.

147, Int'l Bhd. of Painters*, 775 F. Supp. 235, 236 (N.D. Ill. 1991)).  When deciding whether to

grant a motion to dismiss under Rule 12(b)(7), federal district courts exercise their discretion.  *Id.*

A three-step test guides the analysis.

*First*, the court must determine "whether the party is necessary to the suit and must therefore be joined if joinder is feasible." *Rishell v. Jane Phillips Episcopal Mem'l Med. Ctr.*, 94 F.3d 1407, 1411 (10th Cir. 1996). A party is "necessary" in this sense if:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
>> (i) as a practical matter impair or impede the person's ability to protect the interest; or
>>
>> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1).

*Second*, if the absent person is deemed necessary under step one, the court then considers whether joinder is feasible. This factor asks whether the absent person is subject to service of process and whether joinder will deprive the court of subject matter jurisdiction. *Id.*

*Last*, and if the absent person is necessary but joinder is not feasible, the court must decide whether that person is indispensable. *Rishell*, 94 F.3d at 1411. To "conclude that a party is indispensable, the Court must find 'in equity and good conscience' that the action should not proceed in the party's absence." *Kan. City Royalty Co., L.L.C. v. Thoroughbred Assocs., L.L.C.*, 215 F.R.D. 628, 630 (D. Kan. 2003) (quoting Fed. R. Civ. P. 19(b)). When deciding whether to proceed without a necessary party, a federal court weighs the following factors:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
>
> (2) the extent to which any prejudice could be lessened or avoided by:
>
>> (A) protective provisions in the judgment;

(B) shaping the relief; or

(C) other measures;

(3) whether a judgment rendered in the person's absence would be adequate; and

(4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(b).  "Because Rule 19(b) does not state the weight to be given each factor, the district court in its discretion must determine the importance of each in the context of the particular case."  *Thunder Basin Coal Co. v. Sw. Pub. Serv. Co.*, 104 F.3d 1205, 1211 (10th Cir. 1997) (citing *Glenny v. Am. Metal Climax, Inc.*, 494 F.2d 651, 653 (10th Cir. 1974)).

The court begins its analysis with step one of the Rule 19 analysis, evaluating whether the Uruguayan bankruptcy Trustee "is necessary to the suit[.]"  *Rishell*, 94 F.3d at 1411.  The court concludes that the Uruguayan Trustee isn't a necessary party, and Part B of this section explains why.  Given this conclusion, the analysis need not address step two or three.

### B.      Whether the Uruguayan Bankruptcy Trustee is Necessary to this Suit

Invoking Rule 19(a)(1)(B)(ii), defendant argues that the bankruptcy Trustee is a "person required to be joined if feasible" because the Trustee "claims an interest relating to the subject of the action and is so situated that disposing of the action in the [Trustee's] absence may . . . leave [defendant] subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of that interest."  Fed. R. Civ. P. 19(a)(1)(B)(ii).  When "evaluating possible harm to the defendant[] [the court must] look at the practical probabilities more than the theoretical possibilities."  *Air-Exec, Inc. v. Two Jacks, Inc.*, 584 F.2d 942, 945 (10th Cir. 1978) (considering whether the action lacked indispensable parties under Rule 19).

Here, defendant argues it faces a "significant risk . . . of incurring multiple or otherwise inconsistent obligations if this matter proceeds without the Uruguayan bankruptcy trustee[.]"

48

Doc. 14 at 31.  Defendant expresses concern that this court and the Uruguayan bankruptcy court

will resolve issues of fault differently.  The court does not share defendant's concerns about

multiple or inconsistent obligations.  Unlike the Claw-Back Action and the Culpability Action,

plaintiff's claims in this case do not seek to hold defendant liable to *all* of Cereoil's creditors.

And while this case's claims focus—in part—on the same transaction as the Claw-Back and

Culpability Actions, plaintiff here could recover only for its piece of that transaction.

Trying to show that it faces the prospect of inconsistent obligations, defendant cites

*Northern Arapaho Tribe v. Harnsberger*, 697 F.3d 1272 (10th Cir. 2012).  In that case, the

Northern Arapaho Tribe brought a declaratory and injunctive action against county and state tax

officials in Wyoming.  *Id.* at 1276.  Highly summarized, the issue involved disputed land and

whether that land constituted "Indian Country."  *Id.* at 1277.  Defendants, Wyoming tax officials,

moved to dismiss the action because plaintiff had failed to join a necessary party:  the Eastern

Shoshone Tribe.  *Id.* at 1275.  The Northern Arapaho Tribe and the Eastern Shoshone Tribe

"each possess[ed] an undivided one-half interest in the" Wind River Indian Reservation and thus

each Tribe had an interest in the disputed land.[13]  *Id.*

Our Circuit concluded that the Eastern Shoshone Tribe was a necessary party "required to

be joined" under Rule 19.  *Id.* at 1279.  As relevant here, the Circuit held that the Eastern

Shoshone Tribe was "'so situated that disposing of the action in its absence may leave an

existing party'—namely the State of Wyoming—'subject to a substantial risk of incurring

double, multiple, or otherwise inconsistent obligations because of the interest.'"  *Id.* (quoting

Fed. R. Civ. P. 19(a)(1)(B)(ii) (quotation cleaned up)).  This "substantial risk" existed, the

Circuit held, because "[n]othing would stop the Eastern Shoshone, unbound by the decision,

---

[13]     The two tribes together had ceded the disputed land to the United States in 1905.  *N. Arapaho Tribe*, 697 F.3d at 1275–76.

from relitigating the issue." *Id.* And the "State of Wyoming identifie[d] several contexts in which the issue of Indian country status is being or will almost certainly be litigated again[.]" *Id.* at 1280.

Defendant asserts that this case is like *Northern Arapaho Tribe* because the Trustee already is litigating defendant's liability for Cereoil's bankruptcy in Uruguay. So, defendant reasons, it faces a substantial risk of multiple or inconsistent obligations. The court is not persuaded by defendant's *Northern Arapaho Tribe* argument for two reasons.

*One*, plaintiff in this action seeks monetary damages, not a declaratory judgment or an injunction. Declaratory judgments and injunctions present a higher risk of inconsistent obligations than monetary damages. For example, in *Northern Arapaho Tribe*, the federal court could have declared the land "Indian Country" and then an administrative proceeding involving the Environmental Protection Agency could have declared the land not "Indian Country." A declaratory action involving this kind of controversy was likely to produce a binary outcome: Indian Country or not Indian Country. But the outcome here isn't likely to yield a binary result. The Trustee's declaration testifies that any amounts plaintiff collects in this action "will be deducted from the amounts that [plaintiff] is owed in Cereoil's bankruptcy proceeding." Doc. 21-2 at 2 (Ferreira Decl. ¶ 11). Defendant never disputes this proposition. No matter the result, this court possesses the procedural capacity to prevent a double recovery.[14]

---

[14] Defendant expresses concern that, even if the Trustee reduces plaintiff's recovery in the bankruptcy action, the Trustee will not reduce the relief sought in the Claw-Back Action. So, defendant argues, "both courts could find [defendant] liable for the value of the challenged grain transaction—resulting in [defendant] paying up to 200% of the value of the transaction as damages, and presenting the precise risk of double obligations[.]" Doc. 24 at 31. But this action doesn't seek to hold defendant liable for the *entire* transaction. Instead, it only seeks to hold defendant liable to the extent of plaintiff's piece of that transaction based on the Comfort Letter. Defendant speculates that the Trustee will not take this lawsuit into account in the still-pending Claw-Back Action. This court does not hold such little faith in the Uruguayan bankruptcy proceeding, nor does defendant's unsupported speculation convince the court that it should dismiss this action.

*Two*, the concerns about "nothing stopping" the Eastern Shoshone Tribe from relitigating the issue can't apply here. The Trustee can relitigate the issue of defendant's liability because, as explored above, the Uruguayan bankruptcy actions differ from this case. And, critically, relitigating could expose defendant to different *results*, not different *obligations*. Rule 19(a)(1)(B)(ii) "compels joinder of an absentee to avoid inconsistent *obligations*, and not to avoid inconsistent adjudications. It is not triggered by the possibility of a subsequent adjudication that may result in a judgment that is inconsistent as a matter of logic." *Wheeler Peak, LLC v. L.C.I.2, Inc.*, No. CIV 07-1117 JB/WDS, 2009 WL 2982817, at *6 (D.N.M. Aug. 15, 2009) (quotation cleaned up); *see also* 4 Richard D. Freer, Moore's Federal Practice – Civil § 19.03 (2022). An inconsistent obligation arises "'when a party is unable to comply with one court's order without breaching another court's order concerning the same incident.'" *Wheeler*, 2009 WL 2982817, at *11 (quoting *Delgado v. Plaza Las Americas, Inc.*, 139 F.3d 1, 3 (1st Cir. 1998)).

Defendant here has identified no such risk. Instead, defendant presents concerns about "'a risk that a defendant who has successfully defended against a party may be found liable to another party in a subsequent action arising from the same incident—i.e., a risk of inconsistent adjudications or results[.]'" *Id.* (quoting *Delgado*, 139 F.3d at 3). But risk of different *results* "'does not necessitate joinder of all of the parties into one action pursuant to Fed. R. Civ. P. 19(a).'" *Id.* (quoting *Delgado*, 139 F.3d at 3). Moreover, the two actions involving those parties do not arise from the same incident—that is, the Uruguayan bankruptcy issues do not address the Comfort Letter.

---

Defendant also expresses concern about indemnity for its obligations.  Defendant plans to defend this action by arguing that other wrongdoers controlled Cereoil, specifically William Johnson, Cereoil's majority owner.  Doc. 24 at 32.  Defendant argues that if "both actions are allowed to proceed, the relative culpability of [Cereoil majority owner William] Johnson on the one hand and [defendant] on the other could easily be resolved differently in the two forums, leading to further litigation to resolve inconsistencies."  Doc. 14 at 30–31.  Yet again, defendant's concern merely presents a concern about inconsistent *results*, not inconsistent *obligations*.  Defendant never explains how different results for Johnson's liability would render defendant "'unable to comply with one court's order without breaching another court's order[.]'" *Wheeler*, 2009 WL 2982817, at *11 (quoting *Delgado*, 139 F.3d at 3).

Defendant also argues that circumstances could emerge that would bar defendant from pursuing an indemnification from Johnson.  Defendant asserts that, if the Uruguayan bankruptcy proceeding finds Johnson *not liable* for Cereoil's bankruptcy and this action finds defendant *liable* for Cereoil's bankruptcy, then defendant could be barred from bringing an indemnification or contribution claim against Johnson.  But defendant does not explain how this might occur—it never provides any issue preclusion analysis.  To say it another way, defendant does not cite any law—whether American or Uruguayan—that would bar it from bringing an indemnity claim against Johnson if this action and the Uruguayan actions come to different results about the issue of Johnson's liability.  Nor does defendant explain how joining the Trustee in this action would solve a future indemnity problem.  Defendant's concern is a purely theoretical one, at least for now.  And "when evaluating possible harm to the defendant[] [the court must] look at the practical probabilities more than the theoretical possibilities."  *Air-Exec, Inc.*, 584 F.2d at 945.

Defendant simply hasn't persuaded the court that its indemnity concerns qualify as a practical probability.

In sum, the court concludes that the Uruguayan bankruptcy Trustee does not qualify as a necessary party to this suit.  This conclusion ends the Rule 19 analysis at step one.  The court thus denies the portion of defendant's Motion to Dismiss (Doc. 13) relying on Fed. R. Civ. P. 12(b)(7).  Next, Part VI takes up defendant's fourth and final ground for dismissal.

## VI.    Rule 12(b)(6):  Failure to State a Claim

The last of defendant's dismissal arguments invokes Fed. R. Civ. P. 12(b)(6), asserting that the Complaint fails to state a claim for relief.  At this stage of the analysis, four of plaintiff's claims remain in the case:  breach of contract (Count I), breach of the covenant of good faith and fair dealing (Count II), promissory estoppel (Count III), and unjust enrichment (Count IV).  The court first outlines the governing legal standard, and then turns to the substance of defendant's arguments as they apply to those four claims.

### A.    Legal Standard

Under Rule 12(b)(6), a party may move the court to dismiss an action for failing "to state a claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6).  For a complaint to survive a Rule 12(b)(6) motion, the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).

When deciding a Rule 12(b)(6) motion to dismiss, the court must assume that the complaint's factual allegations are true, but it is "'not bound to accept as true a legal conclusion

couched as a factual allegation[.]'" *Id.* (quoting *Twombly*, 550 U.S. at 555). And, while this pleading standard doesn't require "'detailed factual allegations,'" it demands more than a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" which, as the Supreme Court explained, "'will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

### B.     Contract Claims

Plaintiff asserts three kinds of contract claims: one asserting breach of contract, one for breach of the covenant of good faith and fair dealing, and finally, a claim for promissory estoppel. The Complaint places the Comfort Letter at the heart of all three claims. Defendant argues that the court should dismiss all three of these claims for the simple reason that the Comfort Letter isn't a contract. So, the court begins with this overarching question: Will the governing law permit a finding that the Comfort Letter is a contract?[15]

### 1.     Whether the Comfort Letter is a Contract

The court already has decided that Kansas law governs plaintiff's breach of contract claims. *Supra* § III.C.1. But the parties do not cite, and the court's own research does not reveal any Kansas authority addressing "comfort letters." As another federal court has lamented, "[a]lthough 'comfort letters' are common devices in business, there is relatively little case law on the extent to which courts will give them any legal effect." *LaSalle Bank Nat'l Ass'n v. Citicorp Real Est., Inc.*, No. 02 Civ. 7868(HB), 2003 WL 21671812, at * 6 (S.D.N.Y. July 16, 2003). In general terms, a "'comfort letter is an instrument written by a third party and is designed to encourage the creation of an agreement between two other parties.'" *Id.* (quotation cleaned up).

---

[15]     Plaintiff attached the Comfort Letter to its Complaint, so the court can consider the Comfort Letter without converting this Motion to Dismiss into a motion for summary judgment. *Tal*, 453 F.3d at 1264 n. 24 ("Exhibits attached to a complaint are properly treated as part of the pleadings for purposes of ruling on a motion to dismiss.").

Kansas courts have concluded that no contract exists when the contract "constitute[s] a declaration" that is "entirely unilateral and not supported by consideration." *Union Nat'l Bank of Wichita v. Brungardt*, 522 P.2d 371, 372 (Kan. 1974). The court takes guidance from the Kansas cases addressing a close relative of the comfort letter: the letter of intent. In *Cragg v. City of Osawatomie, Kansas*, a City Manager provided plaintiff—the city's chief of police—a "letter of intent." 143 F.3d 1343, 1347 (10th Cir. 1998) (applying Kansas law). This letter explicitly stated its intent: the City Manager wished plaintiff to stay employed with the city and the City Manager intended to employ plaintiff from March 31, 1995, to March 31, 1998. *Id.* The City Manager "described this letter as a letter of intent and a contract of employment." *Id.* But just six months later, the city fired plaintiff in September 1995, and plaintiff sued for breach of contract based on the "letter of intent." *Id.* The Tenth Circuit concluded that "the letter of intent ha[d] none of the attributes of a contract." *Id.* at 1348. Specifically, "the document [was] merely a memorandum of [the City Manager's] unilateral personal intent to retain plaintiff's services as chief of police during the remainder" of the City Manager's term of office. *Id.* "There [was] no offer or acceptance noted in the document, nor [was] there any evidence of the fundamental requirement of a meeting of the minds." *Id.*

The Comfort Letter at issue here is similar. It provides:

> [Defendant] intends to maintain its present interest in [Cereoil and Nolston] as well as its financial, operational and trade relationships with them.

> [Defendant] confirms to the Bank that it has been and currently is our time honoured and continuing policy to have our affiliates, partly or wholly owned, meet all of their financial and contractual obligations, as approved by such affiliates' boards of directors. Nonetheless, by accepting this letter, you acknowledge that this letter is not a guarantee, but rather merely states our intention to monitor [Cereoil and Nolston's] financial condition in a timely manner.

> [Defendant] appreciates this letter will be considered a further inducement towards the Bank granting the [$13,000,000] Facility to [Cereoil and Nolston].

Doc. 2 at 4–5 (Compl. ¶ 19); *see also* Doc. 2-1 at 2 (emphasis omitted). Plaintiff concedes that the Comfort Letter does not include a promise to repay—indeed, it explicitly provides, "this letter is not a guarantee." Doc. 2-1 at 2 (emphasis omitted); Doc. 21 at 42 n.19. Instead, plaintiff interprets the Comfort Letter as defendant's promise to monitor Cereoil's financial condition in a timely manner, maintain its relationship with Cereoil, and prudently manage its business. Defendant argues that the Comfort Letter makes none of the promises plaintiff tries to attach to it. And, going a step further, defendant argues that the Comfort Letter does not contain any promises of future action.

Defendant's right. The Comfort Letter is best characterized as a statement of "unilateral personal intent[.]" *Cragg*, 143 F.3d at 1347. The Comfort Letter provides that defendant "*intends* to maintain its present interest" in Cereoil and "states [defendant's] *intention* to monitor [Cereoil's] financial condition in a timely manner." Doc. 2-1 at 2 (emphasis added). It also asserts defendant's past and present practice, *i.e.*, to have its affiliates meet its financial obligations. *Id.* But no reasonable jury applying Kansas law could find that the Comfort Letter makes any promises or otherwise contains any forward-looking language. Plaintiff's interpretation simply rearranges defendant's statements in the letter, transforming its assertions about present intent into a promise of future performance. And that transformation would turn the contract into a guarantee—something the Comfort Letter explicitly provides it is not. This letter "is not a guarantee[.]" *Id.* (emphasis omitted). Kansas law requires the court to "consider[ ] the entire instrument from its four corners," and avoid "results which vitiate the purpose of the terms of the agreement to an absurdity[.]" *Law v. Law Co. Bldg. Assocs.*, No. 111,140, 2015 WL 2131608, at *5 (Kan. Ct. App. May 1, 2015). Plaintiff's interpretation of the letter adds words to the document's four corners and doing so vitiates the Comfort Letter's explicit language. In

short, it would turn the Comfort Letter into a guarantee, even though it says that it is not a guarantee.

The court thus concludes as a matter of law that no reasonable factfinder could find that the Comfort Letter is a contract. It thus grants defendant's Motion to Dismiss (Doc. 13) Count I for breach of contract because plaintiff—without a contract—cannot make a plausible claim for breach of contract. Count I fails to state a claim.

This conclusion about Count I drives the outcome on Count II's claim. It asserts a claim for breach of good faith and fair dealing. Kansas law implies a covenant of good faith and fair dealing in every contract. *Est. of Draper v. Bank of Am., N.A.*, 205 P.3d 698, 710 (Kan. 2009). A "breach of the implied covenant of good faith and fair dealing only occurs when a party impairs or impedes the other party's ability to perform or denies that party rights and benefits due under the contract." *Law*, 2015 WL 2131608, at *8 (citing *First Nat'l Bank of Omaha v. Centennial Park, LLC*, 303 P.3d 705, 716 (Kan. 2013)). But this "'duty of good faith assumes the existence of a contractual right; it does not create one.'" *Nathan C. Niles D.D.S., LLC v. AMCO Ins. Co.*, No. 21-1163-JAR-GEB, 2021 WL 5161761, at *3 (D. Kan. Nov. 5, 2021) (quoting *Terra Venture, Inc. v. JDN Real Est.-Overland Park, L.P.*, 340 F. Supp. 2d 1189, 1201 (D. Kan. 2004) (applying Kansas law)). Since the Comfort Letter does not qualify as a contract as a matter of Kansas law, the Comfort Letter cannot imply a covenant of good faith and fair dealing. The court thus dismisses plaintiff's claim for breach of the covenant of good faith and fair dealing (Count II) because it too fails to state a claim under Fed. R. Civ. P. 12(b)(6).

That conclusion leaves plaintiff's last claim: one for promissory estoppel (Count III).

## 2.     Promissory Estoppel

Defendant asserts the Complaint fails to state a claim for promissory estoppel because plaintiff has failed to allege that defendant ever made any promise to defendant.  Kansas law establishes three elements for a claim of promissory estoppel:

> (1) The promisor reasonably expected the promisee to act in reliance on the promise, (2) the promisee acted as could reasonably be expected in relying on the promise, and (3) a refusal of the court to enforce the promise would sanction the perpetration of fraud or result in other injustice.

*Mohr v. State Bank of Stanley*, 770 P.2d 466, 481 (Kan. 1989).  "Promissory estoppel commonly applies when a promise reasonably induces a predictable sort of action but without the more formal mutual consideration found in contracts."  *Bouton v. Byers*, 321 P.3d 780, 787 (Kan. Ct. App. 2014).  "Because promissory estoppel rests on fairness, its application tends to be especially fact driven and, thus, defies any regimented predictive test."  *Id.*  And the "reasonableness of a party's actions, including reliance on statements of another party, typically reflects a fact question reserved for the factfinder."  *Id.* at 788.

Here, plaintiff alleges that defendant made four promises to plaintiff:  (1) to "monitor Cereoil's financial position in a timely manner," (2) to "maintain its financial, operational and trade relationship with Cereoil," (3) to "tell [plaintiff] what it knew about Cereoil's financial condition when it sought to renegotiate the collateral and guarantees in April 2016," and (4) to "give [plaintiff] notice in time to avoid future advances to Cereoil when [defendant] had reason to believe that Cereoil could not pay."  Doc. 2 at 16 (Compl. ¶ 83).  Plaintiff's allegations base the first two promises from the Comfort Letter, itself.  Plaintiff's allegations derive the last two promises from alleged statements by defendant's representatives.  The court begins with the alleged promises based on the Comfort Letter.

In this respect, the court finds persuasive a federal district court case that applied promissory estoppel to a comfort letter. *LaSalle*, 2003 WL 21671812, at *6 (applying New York law). *La Salle* provided helpful background about comfort letters:

> Generically speaking, a comfort letter is an instrument written by a third party and is designed to encourage the creation of an agreement between two other parties. Sometimes a comfort letter leads to the subsequent involvement of the drafting party in the agreement itself, despite that party's original intent that the letter not create any obligations.
>
> Comfort letters are often drafted by a parent company and are aimed at encouraging a lending institution to issue credit to a subsidiary. The drafter of the instrument wants to avoid incurring liability on the parent company's part for the non-performance of the potential debtor, the subsidiary. Yet, at the same time, the parent wishes to encourage the potential creditor, the financial institution, to enter into a legally binding transaction. In other words, a comfort letter of this type is aimed at being something more than a letter of introduction, but something less than a guaranty or suretyship commitment.
>
> In principle and consistent with other types of gentleman's agreements, courts generally view comfort letters as unenforceable. The parent company, however, may find itself held liable as a guarantor when a court considers the letter in the context of the whole relationship among the three parties and finds it to be part of an implied contract.
>
> The enforceability of a comfort letter depends on a number of factors, the first being the language of the instrument itself. An intent on the part of the drafter to be bound as guarantor is likely to be found if the instrument, despite the fact that it calls itself a "comfort letter," contains operative language such as "guaranty," "contract" or other words of promise. The more detailed the instrument, the more likely a court will be to find it indicative of an intent to contract.
>
> In addition to the language of the instrument itself, the context in which the comfort instrument was written and other external factors may lead a court to find that the drafter assumed the role of guarantor. One such factor is the sophistication of the parties and whether they sought legal advice as to the meaning and legal significance of the comfort instrument. Oral representations and the parties' prior dealings may also affect enforceability: one party may argue that the instrument was part of the contractual relationship between lender and borrower, not merely tangential to it. An instrument is likely to be enforceable if it is customarily viewed in the particular trade or profession at issue as legally binding. Finally, a court may scrutinize the parties' reasons for using the comfort instrument, as well as the role that the instrument played in their agreement. If the recipient of the comfort letter reasonably relied on terms given or implied by the instrument, then that comfort

> letter's statements, even if promissory language has been avoided, may be held
> enforceable under a theory of promissory estoppel or detrimental reliance even
> though the drafter had good reasons for wanting to avoid a formal guaranty.

*Id.* (quoting Herbert Bernstein & Joachim Zekoll, *The Gentleman's Agreement in Legal Theory and Modern Practice*, 46 Am. J. Comp. L. 87, 98–101 (1998) (quotation cleaned up)).

*LaSalle* presented similar facts to the ones alleged here. Marriott provided a comfort letter to a lender. *Id.* at *5. The comfort letter laid out procedures that Marriott would follow if its franchisee defaulted on its loan. *Id.* Specifically, "[T]he following are the procedures that Marriott will follow: . . . Marriott will notify Lender in writing of any voluntary surrender by Franchisee of the Franchise Agreement[.]" *Id.* Later, the lender's successor sued Marriott—invoking a claim for promissory estoppel. The claim theorized that Marriott had failed to notify the lender that the franchisee had violated its franchise agreement with Marriott. *Id.* at *1, 5.

Marriott moved to dismiss the lender's claim, arguing that Marriott's comfort letter was not a legally enforceable contract. *Id.* at *5. The district court, relying on the language in the letter, quoted above, declined to dismiss the promissory estoppel claim. *Id.* at *7. The court reasoned: "Because of the fact-specific nature of the inquiry suggested by the commentary above, [the court] will not dismiss [the lender's] claim at this stage, given that [the lender] has alleged that it received this comfort letter and relied on the obligations stated therein" when conducting business. *Id.* But the court expressed doubt "that the circumstances surrounding the issuance of [the] comfort letter justif[ied] [the lender's] reliance[.]" *Id.* Nonetheless, the court declined to dismiss the promissory estoppel claim because the motion to dismiss stage required the court to allow the lender "the opportunity to develop sufficient facts that show, among other things, that [the lender] in fact relied on the [comfort] letter and its reliance was reasonable given the specific transaction and the parties involved[.]" *Id.*

Plaintiff suggests that the result here should track the result in *LaSalle*, *i.e.*, the promissory estoppel claim should survive a motion to dismiss. But this approach is too simplistic. There are three evident differences between *LaSalle* and this case. *One*, *LaSalle* was decided before *Twombly* and *Iqbal*. *Compare LaSalle*, 2003 WL 21671812, at *1 ("The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." (quotation cleaned up)), *with Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). *Two*, *LaSalle* applies New York's law of promissory estoppel. Kansas law controls here. *Compare LaSalle*, 2003 WL 21671812, at *5 (reciting three elements of New York's law of promissory estoppel), *with Mohr*, 770 P.2d at 481 (reciting three elements of Kansas's law of promissory estoppel). And *three*, under Kansas law, promissory estoppel "tends to be especially fact driven." *Bouton*, 321 P.3d at 787.

While the question is relatively close, the court concludes that the Complaint states a promissory estoppel claim based on the Comfort Letter and attendant factual circumstances. Plaintiff has alleged facts about the negotiations that led to the Comfort Letter. And plaintiff plausibly alleges facts that, if proved true, could permit a rational factfinder to find that plaintiff relied on the Comfort Letter. The court is convinced that the Comfort Letter itself doesn't make any promises—it's a unilateral statement of present intent. But the Comfort Letter also asserts that defendant "appreciates this letter will be considered a *further* inducement towards [plaintiff] granting the [Credit] Facility to [Cereoil]." Doc. 2-1 at 2 (emphasis added). So, the Comfort Letter itself acknowledges that defendant issued the Comfort Letter to help persuade plaintiff to grant Cereoil the credit facility, and that this inducement coincided with other inducements. And

promissory estoppel "provid[es] means to enforce one party's legitimate expectations based on the representations of another party." *Bouton*, 321 P.3d at 787. Notably, Kansas promissory estoppel law suggests that a promissory estoppel plaintiff can rely on a promise or a representation. *See id.* ("Promissory estoppel is an equitable doctrine designed to promote some measure of basic fairness when one party makes a representation or promise in a manner reasonably inducing another party to undertake some obligation or to incur some detriment as a result.").

The question, then, is whether plaintiff has pleaded facts making reliance on the Comfort Letter reasonable. The court has its doubts. But the touchstone of promissory estoppel is reasonableness, and Kansas law requires a factual inquiry into the reasonableness of a party's reliance. *See id.* at 788 ("The reasonableness of a party's actions, including reliance on statements of another party, typically reflects a fact question reserved for the factfinder."). In sum, and though it is close, plaintiff has alleged facts about the Comfort Letter negotiations that, when construed in plaintiff's favor, suggest reliance. The Comfort Letter itself suggests reliance. And the governing legal standard, even under the modern motion to dismiss standard, demands an inquiry anchored in facts. Plaintiff thus states a claim for promissory estoppel based on the Comfort Letter and attendant, alleged representations because "plaintiff plead[ed] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

In coming to this conclusion, the court has focused on the four promises or representations quoted from the Complaint. Promises three and four are based on alleged facts outside the Comfort Letter. For the April 2016 promise, plaintiff alleges that, during negotiations, defendant represented that the Cereoil/defendant grain sale agreement would

62

provide stronger backing for the credit facility than the Amaggi contract.  Doc. 2 at 6–7 (Compl. ¶¶ 32–35).  And plaintiff alleges that those April 2016 negotiations included a promise by defendant to tell plaintiff what it knew about Cereoil's financial condition.  Plaintiff alleges that it relied on this alleged promise.  Also, plaintiff alleges that defendant promised to give plaintiff notice if defendant had reason to believe Cereoil could not pay.  *Id.* at 11 (Compl. ¶ 57); *id.* at 16 (Compl. ¶ 83).  These factual allegations assert enough to state a claim for promissory estoppel, as demonstrated by two recent cases from our court denying motions to dismiss.

In *Barney v. Whitaker*, our court, applying Kansas law, concluded that plaintiff had stated a plausible claim for promissory estoppel despite defendant's argument that the alleged promise was too vague.  No. 19-1329-JWB, 2020 WL 1700351, at *5 (D. Kan. Apr. 8, 2020).  In that case, defendant allegedly had closed a joint account that plaintiff held with their mother.  *Id.* at *1.  When plaintiff contacted defendant about the account change, defendant allegedly told plaintiff not to worry, and promised plaintiff she would receive her inheritance.  *Id.*  When plaintiff's mother died, and after four years of defendant's alleged scheming, no assets remained for plaintiff to inherit.  *Id.* at *2.  Plaintiff brought a promissory estoppel claim based on her brother's promise that she would receive her inheritance.  Defendant moved to dismiss the promissory estoppel claim, arguing, in part, that the promise was too vague.  *Id.* at *5.  The court disagreed and concluded that plaintiff had stated a plausible claim for promissory estoppel.  *Id.*

*Team Industrial Services, Inc. v. Zurich American Insurance Co.* is similar.  No. 2:19-cv-02710-HLT-KGG, 2021 WL 3771691, at *8 (D. Kan. Aug. 25, 2021).  Our court again denied a motion to dismiss a promissory estoppel claim under Kansas law where plaintiff had alleged a promise, expectation, and reliance.  *Id.*  Specifically, plaintiff had alleged that defendant agreed to maintain insurance coverage for plaintiff while plaintiff performed work for defendant,

plaintiff relied on that promise and performed the work, and defendant failed to get insurance. *Id.*

The allegations here are similar—or, at worst, similar enough—to warrant the same result. Plaintiff has alleged that defendant made promises, defendant reasonably expected plaintiff to rely on those promises, and plaintiff indeed relied on those promises. *See* Doc. 2 at 16 (Compl. ¶¶ 83–85). Defendant argues plaintiff's claims fail to rise above the level of speculation. But plaintiff has alleged facts about the April 2016 negotiations and August 2016 communications—"factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The facts alleged don't plead the strongest case for promissory estoppel, but they allege enough to survive a motion to dismiss.

The court recognizes that a fulsome factual review may preclude plaintiff's legal theory. But for now, defendant's motion invites the court to accept its view of the purported facts. And the court simply can't do that. *Brooks*, 985 F.3d at 1281 (explaining that the court must accept plaintiff's "well-pleaded facts as true"); *see also Team Indus. Sevrs.*, 2021 WL 3771691, at *8 ("But [defendant's] argument on [promissory estoppel] is premised on the Court accepting its version of the parties' contractual relationship, which is not proper at this stage of the case on a motion under Rule 12(b)(6).").

**C.       Unjust Enrichment**

Defendant also moves to dismiss plaintiff's unjust enrichment claim for failure to state a claim. As explained above, Kansas law governs plaintiff's unjust enrichment claim. *Supra* § III.C.2. "[U]njust enrichment arises when (1) a benefit has been conferred upon the defendant, (2) the defendant retains the benefit, and (3) under the circumstances, the defendant's retention

64

of the benefit is unjust." *Draper*, 205 P.3d at 706.  But, before the court can reach the merits of the claim, it must address defendant's argument that plaintiff's unjust enrichment claim is time-barred.

Kansas law provides a three-year statute of limitations for unjust enrichment claims. Kan. Stat. Ann. § 60-512; *Walsh v. Weber*, No. 113,972, 2016 WL 4750102, at *9 (Kan. Ct. App. Sept. 9, 2016) ("The statute of limitations for unjust enrichment is 3 years." (citing Kan. Stat. Ann. § 60-512)).  Under Kansas law, the unjust enrichment claim first accrued at "the earliest time the plaintiff had a right to maintain a legal action." *Draper*, 205 P.3d at 715.  And the "statute of limitations begins to run when all of the[] elements" of unjust enrichment are present. *Id.*

Here, the parties entered a tolling agreement that tolled the statute of limitations on plaintiff's claims "for a period commencing on September 9, 2019."  Doc. 2 at 13 (Compl. ¶ 69). So, the question for the court is whether all three elements of unjust enrichment were present before September 9, 2016.  So, plaintiff's unjust enrichment claim is untimely.

The first element of unjust enrichment—a benefit conferred on defendant—existed in April 2016. *Draper*, 205 P.3d at 706.  Plaintiff alleges that it "conferred a benefit on [defendant] when it restructured its debt with Cereoil from being backed by a contract between Cereoil and Amaggi to [one] being backed by a contract between Cereoil and Seaboard." *Id.* at 17 (Compl. ¶ 87).  This restructuring occurred in April 2016. *Id.* at 6–7 (Compl. ¶¶ 30–35).  So, the first prong of an unjust enrichment claim had crystallized in April 2016.  And for this first element, the tolling agreement can't save plaintiff from the statute of limitations.

The second element of unjust enrichment—defendant retaining the benefit—also occurred before September 9, 2016. *Draper*, 205 P.3d at 706.  Plaintiff alleges that defendant

"realized the benefit of restructuring Cereoil's debt when Cereoil and [defendant] diverted grain that could have satisfied Cereoil's obligations to [plaintiff] to a different contract between [defendant] and Cereoil that [plaintiff] did not have an assignment of credit and a letter of credit." *Id.* at 17 (Compl. ¶ 88). According to plaintiff's allegations, defendant diverted the grain before September 9, 2016.[16] *Id.* at 11–12 (Compl. ¶ 62). This second element of unjust enrichment thus predates the September 9, 2016 tolling agreement date.

This leaves the third element: When did defendant's retention of the alleged benefit become unjust? *Draper*, 205 P.3d at 706. Often, an unjust enrichment action accrues when "property is received by the defendant." *Id.* at 715. And under the Complaint's allegations, defendant diverted the grain to itself—it received the property—before September 9, 2016. This third element also predates September 9, 2016, so all three elements predated the September 9, 2016 tolling agreement date.

Plaintiff tries to negate this chronology's consequences by arguing that defendant's alleged enrichment became unjust when it refused to pay Cereoil's note. Plaintiff alleges that note came due in October 2016, so, it argues, the unjust enrichment claim isn't time-barred because it accrued less than three years before the September 9, 2019 date of the tolling agreement. Doc. 21 at 52.

Plaintiff's argument relies on *Vila v. Inter-American Investment, Corp.* for the proposition that the enrichment became unjust when payment is refused. Doc. 21 at 52 (citing 536 F. Supp. 2d 41, 51 (D.D.C. 2008)). But that case involved defendant's refusal to pay for services, and the court held that the enrichment became unjust at "the point at which services

---

[16]     The Complaint does not explicitly allege when defendant allegedly diverted the grain. *See* Doc. 2 at 11 (Compl. ¶ 59). But it plainly alleges that defendant diverted the grain before Cereoil declared bankruptcy on September 9, 2016. *See id.* at 11–12 (Compl. ¶¶ 59–62).

have been rendered and payment is refused." *Vila*, 536 F. Supp. 2d at 51.  But this case doesn't involve services or a refusal to pay for them.  Here, defendant allegedly received property under circumstances making retention of the property unjust at the moment plaintiff received it.  In other words, plaintiff's action accrued when "property [was] received by the defendant" because this was the moment when defendant was enriched.  *Draper*, 205 P.3d at 715.

The court holds that the Kansas statute of limitations bars plaintiff's unjust enrichment claim.  The court grants defendant's motion to dismiss Count IV for that reason.

## VII.   Conclusion

As explained above, the court dismisses plaintiff's claim for breach of contract (Count I) and its claim for breach of the covenant of good faith and fair dealing (Count II).  They fail to state a claim because the Comfort Letter is not a contract.  The court also dismisses plaintiff's unjust enrichment claim (Count IV) because the three-year statute of limitations bars it.  The court dismisses these three claims with prejudice.[17]  And the court dismisses plaintiff's tort claims—fraud (Count V), negligent misrepresentation (Count VI), and fraud by concealment (Count VII)—based on the forum non conveniens doctrine.  The dismissal of these claims is without prejudice.

Plaintiff's promissory estoppel claim (Count III) survives.  Kansas law applies to this claim, so the court cannot dismiss it under forum non conveniens.  Nor can the court abstain

---

[17]  Generally, "a dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile[.]"  *Knight v. Mooring Cap. Fund, LLC*, 749 F.3d 1180, 1190 (10th Cir. 2014) (quotation cleaned up).  Giving plaintiff leave to amend these claims here would prove futile.  Count IV is time-barred.  And plaintiff bases Count I and Count II on a contract that just isn't a contract.  Nor has plaintiff identified any facts that would shore up the claims these court dismisses.  The court need not grant leave to amend where plaintiff "fail[s] to identify the specific factual allegations [it] would allege in an amended complaint."  *Carroll v. Lawton Indep. Sch. Dist. No. 8*, 805 F.3d 1222, 1231 (10th Cir. 2015).

from deciding it.  The Uruguayan bankruptcy Trustee is not necessary to decide plaintiff's promissory estoppel claim.  Because plaintiff states a plausible claim for promissory estoppel— the court must allow plaintiff an opportunity to develop facts about its reliance on the Comfort Letter.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion to Dismiss (Doc. 13) is denied in part and granted in part, as explained in detail in this Order.  The claims dismissed under forum non conveniens are dismissed without prejudice and subject to the conditions stated in this Order.

**IT IS FURTHER ORDERED BY THE COURT THAT** defendant's Motion to Take Judicial Notice (Doc. 15) is granted.

**IT IS SO ORDERED.**

**Dated this 23rd day of September, 2022, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
